ARK. STATE HIGHWAY COMM. *v.* SPECK.

5-1919                                        324 S. W. 2d 796

Opinion delivered June 1, 1959.

*W. R. Thrasher, Edward Boyett, Bill B. Demmer,* for appellant.

*James E. Hyatt, Jr.,* for appellee.

CARLETON HARRIS, Chief Justice. This appeal concerns a condemnation suit filed by the Arkansas State Highway Commission condemning a 28.075 acre tract of land in Mississippi County, complaint being filed under authority of Act 419 of 1953. Declaration of Taking was also filed under authority of Act 383 of 1953, and under the latter act, a deposit of $12,906.00 was made by the Commission, and title to the lands was immediately vested in it. The tract from which this acreage was taken contained approximately 760 acres, and the designated highway route severs an additional 25 to 30 acres of land which will, after construction of the highway, be south and east of the remaining farm unit. The proposed highway (interstate highway No. 55) will consist of two lanes of pavement, one for traffic proceeding north and the other for traffic proceeding south. The proposed highway will be a controlled-access highway, *i.e.,* ingress and egress to the main lanes will only be at designated points. The cause proceeded to trial in January, 1959, and after hearing the evidence, the jury returned a verdict in favor of appellees in the amount of $34,600. From the judgment accordingly entered, appellant brings this appeal. For reversal, appellant relies upon only one point, *viz*:

"The Court erred reversibly in permitting witnesses in behalf of the landowner to testify as to the 'cost' of various improvements which might be made by the landowner after and as a result of the condemnation action by the Arkansas State Highway Commission."

The evidence reflects that this 760 acres was operated as a rice farm; the farm was operated as a unit, but because it is necessary that rice be rotated every two years, two separate rice fields, with well and irrigation systems, were established and maintained, together with adequate roads and storage facilities. The headquarters and one field were located on the north part of the farm, and the other field, consisting of 240 acres, was operated as the south farm. The taking of the land bisects and severs the south rice field, leaving 189 acres west of the right of way, and approximately 28 acres east of the right of way. Appellees contended that their means of ingress and egress (a road which they had constructed) had been cut off; that there is no road from headquarters south through the farm to this south field. Mr. Speck[1] testified that the new highway would not allow him to cross from the east to the west . . . that to farm the 189 acres south of the drainage ditch, it would be necessary to build a road from the headquarters to the south portion of the land with a bridge[2] spanning the drainage ditch . . . that even then, he would not have as good a farm as before the taking. Mr. Speck listed additional improvements that would have to be made because of the farm being split, such as an additional well at an approximate cost of $7,400 . . . an additional flume at a cost of $250 . . . as a matter of damage, he testified that after the highway is built, he will have to travel over five miles to reach a hard surfaced road, whereas presently it is only necessary to travel about three-fourths of a mile. Speck valued the land south of the drainage canal at $350 per acre before

[1] Mr. Speck is primarily a farmer; however, he teaches at Memphis State University in the mathematics department two nights a week, and holds a BS degree from the Georgia Institute of Technology, and a BS degree in electrical engineering from the same school.

[2] Mr. Speck testified the construction of the bridge would cost about $18,437 (concrete).

the taking, arriving at that figure by calculating the income basis, the soil bank payments, the amount paid for the land, clearing and leveling, and number of flumes that were built. He placed a value of $100 per acre upon this land after the taking, mainly due to the inaccessibility of the 189 acres. The witness testified that in his opinion, the fair market value of his farm before the taking was $265,240; that after the taking, the farm would be worth $202,182, or a difference of $63,058.[3] He stated that his land would receive no benefits, but only detriments from the highway.

Lee Wesson, a farmer and resident of Mississippi County for twenty-three years, testified that he operated a 7,700 acre plantation with about 276 acres in rice. Based upon his experience in farming rice and cotton, including the cost of acquiring rough land and developing it, it was his opinion that the value of the farm before the taking was $266,000, and the value of the property after the taking was $181,200, or a difference of $85,800.

Elliott Sartain testified that he had been requested by Mr. Speck to make an estimate of the cost of construction of a road on the Speck farm. He testified that the distance would be about two and three-fourths of a mile . . . that the soil over which the road would run, would be gumbo . . . that quite a bit of leveling would be necessary, and that ditches would have to be dug for the proper maintenance of the road. He estimated the cost of the road at $20,449, and broke this figure down.

Curtis Anderson, engaged in the real estate business in Blytheville, testified that he had handled loans for Prudential Insurance Company for approximately seven years . . . had taken two courses in real estate appraisal (at Michigan State University and Notre Dame) . . . two years of college at the University of Missouri . . . has handled FHA and GI loans . . . has personally made appraisals for companies making loans, including Travelers of Hartford, John Hancock

---

[3] Appellees' answer alleged that they had been damaged in the amount of $68,203.75.

and Northwest Mutual . . . appraises from one million to one and three-quarters million dollars of property each year, and has been approved by the Bureau of Public Roads and the Highway Department of Missouri. The testimony of Mr. Anderson reflects that he made a very comprehensive survey of the Speck farm. He did not testify to any restoration costs, but stated that he used three methods in arriving at his figure of the fair market value before the taking, *viz.*, the income approach, the comparable sales approach, and the reconstruction less depreciation approach. Mr. Anderson then stated that he only used the income and cost approach as a check against his final evaluation. The witness testified that in his opinion, the Speck property was worth $181,750 before the taking, and $142,000 after the taking, a difference of $39,750. He estimated the value of the acreage taken at $250 per acre, or a total of $7,000, and then stated that the balance of $32,750 represented severance damages.[4]

Mr. A. W. Hardy, employed as a Right of Way Engineer for the Highway Commission,[5] testified that the abutting property owners on the highway could not be allowed ingress and egress other than at designated in-

[4] From his testimony: "Q. Would you explain to the jury how you arrived at that fact and figure? A. Well, there was two things that were obvious, of course. One was the well located here. * * * Pointing to the second farm, center of Section 34. Well is located on the south line of the property. Could not any longer put water to this 25 acre tract after the improvement is made, highway through there. Second was this access road from the present highway No. 61, would be stopped and the land here would have a very decided loss in value because it is no longer accessible. Q. You say it is no longer accessible, what do you mean? A. By the same type road it had. It is possible you can get to this. In fact, I think there is a turn row from the south side of this farm. Q. Turn row? A. A turn row from another man's farm, would come, wind out to 77 some distance away. Wouldn't be very practical to use. The thing I am pointing up, if you are looking for a buyer for the land, the man right to the south, adjoining, would be the only prospect. Q. Because of what? A. Access, poor access. No overpass, no service roads on the side of the new highway. Any way you get in there is going to have to come from away from the highway right-of-way. Q. Was there any public roads to the south, county roads, gravel roads, suitable to give access to the west 189 acres? A. No, sir. This road going south, if it is a public road—doesn't have the appearance of being, is a dirt road. Could not be used to haul grain out for instance."

[5] Mr. Hardy has been with the Commission in various positions for a number of years, and received his engineering education at the University of Oklahoma.

terchange points. He stated, relative to the Speck property, that there is a grade separation at Frenchman's Bayou and at Manasha, and that local traffic may pass over the main thoroughfare at those points. He also testified that one could go to the Jericho Grade Interchange located at Joiner, on the north of the Speck property; if south of the Speck property, or going in that direction and desiring ingress or egress to the two main lanes, one could go to the Lake David Interchange north of Turrell, Arkansas.[6] Hardy testified about other routes that could be taken from the northern portion of the Speck property to the southern portion and stated that drainage in respect to the Speck property will be normal and adequate. As to the severed 25 to 30 acres, the witness testified that it is possible to pipe water underneath the highway from the west side to the east side so that the well may still be used to supply water on the east side, and that it would not cost in excess of $300 to construct a flume beneath the highway. He testified that the shoulder of the ditch on the west side of the highway would be level with the Speck property, and if a rice farm was operated on this land, it probably would be necessary for some adaptation to be made in order to retain the water in the rice field.

Mr. George Wiggs of Blytheville, a real estate dealer, testified that he had appraised residential, commercial and real property, primarily in northeast Arkansas and southeast Missouri; that he had appraised approximately one-fourth of the area in Mississippi County. Mr. Wiggs attended an appraisal course at the University of Tennessee, and one at Michigan State University . . . attends appraisal institutes regularly each year . . . is on the Board of Directors of the Blytheville Real Estate Dealers, and has served as president of the organization. He explained the method of arriving at his appraisal, though he testified that he knew of no rice farms that had actually been sold in the county, and considered it difficult to determine the fair market value of an established rice farm. Admittedly, his figure of

---

[6] It is approximately three miles between the Lake David Interchange and the Jericho crossing, and approximately five to six miles between Lake David and Frenchman's Bayou.

$25 per acre damage to the 189 acres was reached by "hearsay"; that is, he asked other people. Mr. Wiggs concluded that the value of the property before the taking was $158,750, and after the taking, $145,800, or a difference of $12,950.

Mr. Herbert Hooten, an appraiser for the Highway Department for the last 18 months, testified that he had previously worked for the Government for over seven years on farm loans and chattel loans, covering nine counties in this state. He holds a degree from the College of Agriculture, University of Arkansas. Mr. Hooten testified that he did not own any property in Mississippi County, but that he was familiar with the market value of property in the county after having made a study. After detailing the method of his appraisal, Mr. Hooten testified that in his opinion, the property was worth $190,000 before the taking, and $177,000 afterward, or a difference of $13,000.

It might be here noted that all of the witnesses pretty much detailed their findings, describing the steps taken in appraising the premises, and giving their reasons for the figures reached.

In American Jurisprudence, Vol. 18, page 910, para. 269, we find:

"When part of an owner's property is taken for a public use, the owner may be damaged from inability to make the most advantageous use of the remaining land without additional expense. The cost of restoring the remaining land to a condition that will make it available for use, if a reasonable and proper method of meeting the damage caused by the taking, is a proper element to consider."

Also, Vol. 85, American State Reports, lists the following elements of damage as proper: cost of fencing (p. 304), cost of crossings, gates, or cattle-guards (p. 305), obstruction of ingress or egress, *etc.* In *Louisiana Highway Commission* v. *Treadaway*, La. App. 173 So. 209, testimony as to the approximate cost of two bridges that would be required after condemnation pro-

ceedings was approved. In *Louisiana Highway Commission* v. *Bradberry,* La. App., 193 So. 198, the Court said:

"In these records, however, we do not find any evidence touching upon the cost of construction of bridges, and therefore, though we conclude that each of the property owners is entitled to the amount which it will be necessary for him to expend to erect these bridges, or, in the alternative, to construct the ramps, we are unable to say what this cost will be. We therefore find it necessary to remand all of the cases in order that there may be introduced evidence touching upon the cost of these bridges, or the cost of the alternative ramps."

See also *State Highway Commission* v. *Pope, et al,* 228 Mo. App. 888, 74 S. W. 2d 265. Appellant admits that the above citations express the general rule, but attacks the lack of logic of the rule, and states that many cases, in apparent accord, actually pay only "lip service" and do not allow testimony of dollar and cent costs of restoration. This "hypothetical" dollar and cent testimony of possible further improvement to the remainder of a parcel of land after condemnation, is the sole point of objection by appellant. In its brief, appellant states:

"Yet, while adopting this position, the appellant has no objection to a landowner or his expert witnesses stating detriments such as inconvenience of operation, possible additional labor and the necessity of other various corrective measures which are appreciable and substantial in nature without which there is a reasonable tendance to lesson the market value of the land remaining." But appellant asserts that testimony of restoration costs is not practical. From its brief:

"First, what type of improvement should be considered for restoration purposes? Should a possible bridge be constructed of wood, of concrete, of steel or of some new miracle fabric? The cost in dollars and cents would certainly vary tremendously from this standpoint above. The same conclusion may be reached when considering the manner of construction. Should the bridge be a sus-

pension type, poured concrete, or closer set type treated wood posts? These same questions might be asked for construction of fencing, adding additional wells, the leveling of land, and construction of roads and each and every element which in any way might be said a needed improvement to make the remainder usable.''

We do not agree with appellant's contention, for we see no logic in permitting a witness to testify that a fence, bridge, or road will have to be constructed, but at the same time, hold inadmissible the probable cost of such construction. To declare such evidence inadmissible, would be to leave the matter to absolute ''guess work''. It goes without saying that many jurors would have no idea of the cost of various items necessary for restoration. Appellant says that this evidence of approximate costs permits the jury to speculate; we take a contrary view, for without such testimony, any amount reached would be through sheer speculation. So if evidence of improvements for restoration purposes is proper (and this is admitted by appellant), the purported cost of such improvements is admissible. As to appellant's argument, just quoted, we think it proper for the jury, after hearing the evidence, to determine the type of improvements that will more nearly restore the property to its original status. Let it be borne in mind that these prospective expenditures are not the measure of damages, but are only an aid in determining the difference in the before and after value of the property. Actually, we have already approved this type of evidence. In *Kirk v. Pulaski Road Improvement District No. 10,* 172 Ark. 1031, 291 S. W. 793, a street (also a state highway) next to the landowners property, was widened, and it became necessary to excavate the high bank in front of appellants' property. Appellants contended that the blasting away of the slate in excavating for the extension of the street, loosened the earth and rock back beyond the property line, thus invading their property; this caused the bank to cave from time to time, and appellants contended that a retaining wall would have to be built to afford protection from the injury. On appeal, this Court said:

"The record also shows that it would cost more than $2,000 to erect a retaining wall which would prevent the embankment of the plantiff's property, abutting the improved street, from further caving in. *While this proof was competent to show the damage to plaintiff's property*[7] it was not the measure of her damages. In cases of this sort, the owner is entitled to recover the difference between the market value of her property before the taking or damage to it and the market value afterwards." In *Stuttgart & Rice Belt R.R. Co.* v. *Kocourek,* 101 Ark. 47, 141 S. W. 511, the railroad company filed a petition to condemn a right-of-way through 160 acres of land belonging to appellee. The actual right-of-way occupied and consumed seven acres of the land, but appellee contended that he had good rice land, but because of the building of the road across it, the land could not be used for rice without two pumping stations, which would cost $2,500. In affirming a judgment for $1,500, and quoting from earlier cases, this Court said:

"As a general guide to the range which the testimony should be allowed to assume, we think it is safe to say that the landowner should be allowed to state, and have his witnesses state, every fact concerning the property which he would naturally be supposed to adduce, in order to place it in an advantageous light if he were attempting to negotiate a sale of it to a private individual. * * * The elements which enter into such an estimate are not alone the market value of the land actually appropriated, but include also the injury to the owner's remaining land, arising from the increased difficulty of communication between the parts of the severed tract, the inconvenient shape in which the remaining land is left, the cost of new fences, required in consequence of the construction of the railroad, the increased exposure to fire, so far as it depreciates the value of the residue of the land, and various other causes, provided they are not of a remote or speculative character."

Appellant also contends that to permit such evidence would require a condemnor to not only secure evi-

---

[7] Emphasis supplied.

dence rebutting the reasonableness of the particular improvement but further to secure rebuttal as to the cost of the improvement. From appellant's brief:

"This is indeed an involved task for these factors are unknown prior to trial and would require knowledge as to the specifications, *etc.*, of the improvements under consideration."

In the case before us, Jefferson Speck and wife alleged in their answer that they had been damaged in the amount of $68,203.75, asserting the value of the property taken as $9,803.75, and the balance as damages by reason of the severance of their property. Appellant, had it so desired, could have filed a motion asking that the answer, wherein this amount of damage was asserted, be made more definite and certain, and that appellees be required to specifically break down the alleged damage to their property. We accordingly are unable to find merit in this contention.

No reversible error appearing, the judgment is affirmed.