STATE HIGHWAY COMMISSION, Appellant

v.

HAYES ESTATE, et al., Respondents

(140 N.W.2d 680)

(File No. 10197. Opinion filed March 3, 1966)

**Frank L. Farrar,** Atty. Gen., **John B. Wehde, Carl W. Quist** Asst. Attys. Gen., Pierre, for plaintiff and appellant.

**Hanley, Costello & Porter,** Rapid City, for defendants and respondents.

HOMEYER, Judge.

This is an eminent domain proceeding by which the State Highway Commission of the State of South Dakota, hereinafter referred to as the State, has condemned certain land owned by Candace Hayes and her daughter, Charlene L. Schell, hereinafter referred to as the Hayes estate, as a part of the construction of Interstate 90 between Rapid City and Wall, South Dakota. A jury awarded the Hayes estate the sum of $69,337.00 for the property taken and damaged. The State appeals from the judgment entered on such verdict. The amount allowed has not been challenged either by motion for new trial or other proper procedure. In seeking a reversal the State contends the court erred prejudicially by various rulings made during the course of the trial.

Prior to the taking; the Hayes estate ranch consisted of 4,034.61 acres of fee title land. A small amount of additional land was leased and used with the unit. Starting with one quarter section

in 1927, Candace Hayes and her husband, who died in 1949, had enlarged and improved the ranch to its size and condition at the time of condemnation. The State took for highway purposes, channel changes, borrow pits and other construction needs, a total of 168.14 acres of which 8.42 acres was section line. The right - of - way taken for the most part is 300 feet wide and crosses the entire ranch from east to west, a distance of about 3 1/2 miles, and leaves 1,351 acres with the ranch buildings north of the interstate and the remainder of 2,515 acres south of it. Interstate 90 as it crosses the Hayes property is a two - lane controlled - access divided highway and the outside right - of - way line is fenced. An interchange is located near the east boundary of the ranch. The State constructed a 5 x 7 cattle pass beneath the highway. This is the only means of access for livestock from the north portion to the south portion of the ranch; otherwise they would have to be trucked. The evidence was conflicting as to the feasibility and extent to which the cattle pass could or would be used. Machinery can only be moved from one side of the interstate to the other via an overpass at the interchange.

The ranch before the taking was all contiguous or cornered, somewhat irregularly shaped, and was bordered on the north and west almost in its entirety by the Cheyenne River. U. S. Highway 14 - 16 formerly was located on the north side of the Cheyenne and traversed a small area of the ranch north of the buildings. There were no restrictions on crossing such highway and the acreage north and east thereof was for the most part cropland with a small part being used for hay and alfalfa, and for winter range.

Monte Schell, the husband of Charlene, has operated the ranch since 1956. In his testimony he gave a detailed description of the ranch, its operation, and the effect of the taking upon its future operability. It was described as a well balanced diversified beef and feeder ranch capable of handling 300 stock cows on a year - around basis. Balance meant it had sufficient summer pasture, winter range, shade, shelter, water, hay land, alfalfa ground, and cropland to sustain its full potential throughout the year with minimum effort and expense. Live water was provided cattle through uninhibited access to the Cheyenne River which

since construction of the Angostura Dam maintained a consistent flow through the seasons. In the rougher area of the ranch dams had been constructed which were dependent on snow runoff and rainfall for utilization. Two shallow wells were also located on the property; one at the headquarters and the other towards the north portion of the property.

The summer pasture for the most part was located in the west and northwest portions of the ranch adjoining the Cheyenne River. In the southwest portion was a hay meadow of about 120 acres which was flood irrigated and described as "the heart of the operation" because it served as the source of an abundant supply of hay even in the driest of years; the average being about 300 tons annually. This meadow was isolated by the taking and required construction of access roads to permit future use. The State witnesses said it should be abandoned and reverted to summer pasture and other land should be converted to haying and forage crops. The landowner's witnesses contended otherwise. Travel distance between the hay meadow and headquarters before the taking was 3 1/2 miles over relatively flat terrain; on the new road it would be increased to 10 miles over rough ground.

The normal operation would put the stock in the summer pasture area in late spring or early summer and move them to the east portion and nearer the headquarters in late fall or early winter. The topography of the latter area was such that the rough ground and breaks would serve as natural shelter from prevailing northwesterly winds. Hay and feed crops would be moved from the southwest meadow and other feed producing portions of the ranch to an area near the headquarters where it was easily accessible for winter feeding. Spring calving would also occur in the pasture areas near the headquarters and cattle had free access from the south to the buildings and pens near the headquarters and could be easily nursed, fed and cared for.

The land taken by the State begins where Interstate 90 crosses the Cheyenne River south of the town of Wasta and follows the low lying portions of the ranch and meanders between the bottom land and breaks. The route in general traverses

the same trail formerly used in traveling from the headquarters to the west and southwest parts of the ranch and in moving hay from the southwest meadow to the headquarters. Two stock dams were destroyed by the construction.

The State contends the trial court erred prejudicially when it permitted the witness Schell to testify to estimated costs of rehabilitating and restoring the ranch to usability after the taking.

■■■ The measure of damages in condemnation cases involving a partial taking is the difference between the fair market value of the unit before the taking and the fair market value of what remains after the taking. City of Bristol v. Horter, 73 S.D. 398, 43 N.W.2d 543; State Highway Commission v. Fortune, 77 S.D. 302, 91 N.W.2d 675. In the application of this rule severance damage to the remaining property is included in an award without being designated as such and the amount allowed for the property actually taken is not segregated from the damage to the remainder. In estimating the damages to the remainder, or in other words, the depreciation in value of the part not taken, the landowner is entitled to have the jury informed as to all those facts which legitimately bear upon the market value of the ranch before and after the taking and those factors which would ordinarily influence a prospective purchaser in negotiating for the property. The manner in which the ranch was used before the taking and the manner in which it can be used afterwards is of prime importance. Anything which is directly injurious to its particular adaptability or detracts from its use at maximum efficiency affects market value and is competent and a legitimate factor in establishing total damages sustained within the contemplation of an award of just compensation. 18 Am.Jur., Eminent Domain, § 266.

■■■ As a general rule, in determining the diminution in market value of the land not taken, it is proper to take into consideration the expense made necessary by the improvement, 29A C.J.S. Eminent Domain § 164, in order to restore the land to its most advantageous use, 18 Am.Jur., Eminent Domain, § 269, or in adjusting it to the changed conditions brought about by the taking. Pima County v. De Concini, 79 Ariz 154, 285 P.2d 609;

Wood v. Wyoming County Court, 100 W.Va. 29, 129 S.E. 747; Currie v. Glasscock County, Tex.Civ.App., 212 S.W. 533; 4 Nichols on Eminent Domain, 3rd Ed., § 14.247.

In Pima County v. De Concini, supra, the court said: "If the damaged property can be advantageously reconstructed or re-arranged, then the cost of such reconstruction or rearrangement is a matter that should be considered by the court or jury in fixing the market value subsequent to the taking. * * * 'We think these matters were properly received in evidence as **descriptive** of the injury inflicted, and the burden imposed on the property by the occupation of it for railroad purposes, and that they were for the consideration of the jury, not as specific items of claim, but as affecting market value.' The rule also is that in arriving at the market value of land which has been damaged by the exercise of the right of eminent domain the court has a right to admit evidence of possible expenditures which, if expended, would diminish the damages." However, the court said the expenditures must not exceed the difference in market value before and after the taking. Such would not occur in the instant case.

In the light of these principles we review the record on ap-pellant's claim of prejudicial error. The witness, Monte Schell, emphasized constant availability of "live water" from the Chey-enne as a major element in the before value of the ranch and its loss or marked curtailment of use as of primary significance in fixing the after value. Without objection by the State, he testified to a dearth of a water supply south of the highway, particularly in years of short rainfall when the dams were dry, except for the river. He also doubted the availability of water in shallow wells and said he had been told that to reach water in the artesian basin would cost from $17,000 to $20,000. This figure was written by him with a grease pencil on a tear sheet mounted on an easel without objection.

The river boundary of a portion of the ranch. is in the form of a loop. The draws in the rougher part drain towards this area which was wooded along the river and relatively flat until it reached the north edge of the right - of - way taken. To permit

drainage from the south, the State placed twin 8 x 6 concrete culverts beneath the highway and other smaller culverts in the same area. The witnesses for the Hayes estate generally felt that the running of a head of water through these culverts would cut and erode the land north of the highway so as to form gullies and ditches splitting the loop area into nonusable segments; but that the damage could be minimized by building spreader or diversion dikes. Schell estimated $5,875 as the estate's portion of the total cost and again this figure was given and written on the tear sheet without objection.

The cattle pass called for by the construction plans opened into a pasture area of about 12 acres with a river cliff to the north, a gorge from 40 to 50 feet deep to the west, and the better cropland to the east. This gorge prevented access from the headquarters and east part of the ranch to the flood irrigated bottom land, summer pasture and shelter in the loop area. To move machinery or cattle, Schell testified a road would have to be built across this gorge and he estimated the cost at between $7,000 and $8,000. Again this testimony was given and written on the tear sheet without objection by the State. The need for this road was undisputed and its construction by the State was called for in the original plans which would have mitigated the damages. Session Laws of South Dakota, 1963, Ch. 195, § 1(6). Apparently the decision to relieve the State from this obligation was made about a week before trial because one of the State's witnesses testified he increased his damage figure $8,000 when he was told the burden of such construction devolved upon the property owner. A smaller gorge is located to the east and Schell testified to permit access to and from the headquarters to the loop area a culvert and some dirt fill was necessary and he estimated this cost at $2,000. Again this testimony was given and the figure written on the tear sheet without objection.

■ ■ To this point we doubt if the State is in a position to assert error for it permitted this testimony without objection and apparently consented to its introduction. In such case generally, unless the failure to object is excusable, the reception of such evidence cannot be successfully challenged by a motion to strike made after such evidence has been admitted. 88 C.J.S. Trial

§ 136. Further, the State's witnesses acknowledged most of these restoration costs were necessary and the costs thereof reasonable in order to continue to use a substantial part of the ranch.

As a result of the taking cropland and hay land in the east portion of the ranch remained on both sides of the interstate and the winter range was separated from the headquarters where the winter feed was stored. When Schell began testifying to the need of a culvert and dirt fill to cross a deep gorge to get to this crop and hay land and to the winter range, the State for the first time objected to this line of testimony on the ground that the economic necessity for such construction had not been shown, and the objection was sustained. Schell then in great detail explained the operation of the unit before the taking and how it could be operated afterwards by construction of various roads permitting access to the segregated portions of the ranch. When asked to give an estimate as to the cost of such roads objection was made that it was an improper measure of damages. The objection was overruled. Subsequent testimony fixed the needs for shelter, corrals, sorting pens, etc. on the south side of the interstate with costs thereof; destruction of dams and costs of replacement; costs of additional equipment made necessary by reason of readjustment and rearrangement of operation; estimates of extra trucking expense and costs of travel required in operating the ranch. The figures were written on the tear sheet as this testimony unfolded with objection either that economic necessity was not shown or that this was an improper measure of damages. The tear sheet was offered and received in evidence at the conclusion of Schell's testimony.

We have reviewed the record carefully with reference to the manner in which the rehabilitation, rearrangement, restoration, and readjustment testimony was received. The evidence of the economic need and costs on many of the items set forth is undisputed and where disputed is supported by credible testimony. Much of it became a part of the record before objection was made and in fact a substantial portion is supported by State witnesses. Counsel offered and the court received the evidence on specific costs not as separate items of damage, but for a limited

purpose, viz: "* * * only * * * insofar as it may be material to the consideration of the reasonable market value * * * of the entire tract before the taking and the value of the remainder after the taking."

■ ■ We understand the State does not contend that the evidence detailed is inadmissible. Clearly, it is admissible under the rule recently restated in State Highway Commission v. Bloom, 77 S.D. 452, 93 N.W.2d 572: "Any elements of detriment such as additional labor, expense or inconvenience in the operation of the remaining land as a ranch which were appreciable and substantial in nature and had a reasonable tendency to lessen the market value of the land could be taken into consideration. **These items of injury are not to be allowed as separate items of damage, but are only to be considered in determining the reduction in value of the remaining tract."** (Emphasis supplied.) However, the State emphatically argues that allowing dollar and cents testimony on cost of the specific items of restoration, rehabilitation, and other factors which detracted from market value, constituted prejudicial error.

Substantially the same contentions were made in a recent highway taking case, Arkansas State Highway Commission v. Speck, 230 Ark. 712, 324 S.W.2d 796 at 800, and were rejected by that court in language which we approve and adopt, viz:

"We do not agree with appellant's contention, for we see no logic in permitting a witness to testify that a fence, bridge, or road will have to be constructed, but at the same time, hold inadmissible the probable cost of such construction. To declare such evidence inadmissible, would be to leave the matter to absolute 'guess work.' It goes without saying that many jurors would have no idea of the cost of various items necessary for restoration. Appellant says that this evidence of approximate costs permits the jury to speculate; we take a contrary view, for without such testimony, any amount reached would be through sheer speculation. So if evidence of improvements for restoration purposes is proper (and this is admitted by appellant), the purported cost of such improve-

ments is admissible. As to appellant's argument, just quoted, we think it proper for the jury, after hearing the evidence, to determine the type of improvement that will more nearly restore the property to its original status. Let it be borne in mind that these prospective expenditures are not the measure of damages, but are only an aid in determining the difference in the before and after value of the property."

■ ■ Great latitude is allowed in the reception of evidence to prove the value of property in condemnation cases, and generally any relevant and material evidence, if competent under general rules of evidence, is admissible to prove market value. 29A C.J.S. Eminent Domain § 273(1); City of Detroit v. Cristy, 316 Mich. 215, 25 N.W.2d 174; State v Styner, 58 Idaho 233, 72 P.2d 699. No competent evidence should be excluded which an ordinarily prudent man would take into account before forming a judgment as to the market value of property which he is about to purchase. If the proffered evidence tends to aid the trier of fact in arriving at a conclusion on the issue of value and damage, it should be received.

■ ■ The trial court submitted to the jury the single issue involved in the case, "What is just compensation?" under instructions to which the State took no exception. Neither did it propose additional instructions. The court properly instructed on the measure of damages, and advised that they could not award speculative damages and defined what were speculative damages. He also told them it was the duty of the Hayes estate as far as reasonably possible to attempt to minimize its damages and to use all reasonable exertion to avert the injurious consequences resulting to the property from the taking. The instructions were complete and accurate and it is presumed the jury followed them. State v. Reddington, 80 S.D. 390, 125 N.W.2d 58.

Counsel for the State rely heavily upon cases from our sister state of Iowa to support their contentions. We have reviewed these cases carefully. They proceed largely on the premise that if evidence of specific costs is allowed juries may be inclined to add these costs to the after taking market value resulting in un-

fair awards. Such danger may exist in some degree, but we believe the better rule is to admit such evidence for its limited purpose and we feel when properly advised the jury will use it correctly in fixing the landowner's damages.

Roland Twaddle, called as a witness by the State, testified that he was a staff appraiser for the Department of Highways and had held that position for about five years. He proceeded to recite his qualifications and the procedure followed by him in arriving at an opinion of the before and after value of the Hayes estate property and among other things said he investi-gated sales in that area as a preliminary to formulating an opinion. He was asked about one sale involving 1,103 acres which adjoins the Hayes land made in 1962. Foundational querying disclosed lack of "live water" on this property and other dissimilarities including size. Objection to a question on sale price was sustained because the properties were not comparable. In an offer of proof made in chambers, counsel in effect conceded lack of comparability and admitted that such sale should not be received as "independent proof of value", but said it should be received as a part of a foundation for an opinion on value on which he said the rule as to admissibility was less stringent. The offer was denied and such ruling has been assigned as error. The sale price on this tract was $23.50 per acre as shown in the offer of proof.

The witness did not testify as to any other sales which he considered except one located on the Belle Fourche River 15 miles north of the Hayes land made in 1962. It involved about 5,500 acres and changed hands for $20 per acre. The record does not disclose if this was offered as direct evidence of value or as foundational for an opinion on value. In summation the witness expressed an opinion that the before value of the ranch was $30 per acre, or $121,000 and the after value $24 per acre or $92,500, or a total damage figure of $28,500. The deposit in court with application for possession was $20,500 as estimated just compensation.

■ ■ Recent and comparable sales of real estate are admissible as evidence in condemnation cases, either as sub-

stantive proof of value of the condemned property or as foundation and background for an expert's opinion of value. Nystrom v. State, 80 S.D. 58, 119 N.W.2d 123; State Highway Commission v. Lacey, 79 S.D. 451, 113 N.W.2d 50; 5 Nichols on Eminent Domain, § 21.3. If such evidence is admitted on the latter basis, the rule on comparability is not nearly as strict as when it is used as direct and independent proof of value. United States v. Johnson, 9 Cir., 285 F.2d 35. The witness generally testifies to a considerable number of sales and the prices paid to show a pattern and establish a prevailing market price for property in the area of the acquisition. Few sales or a single sale would generally not create such market price. Unless considerable caution is used and the jury is instructed on the separate theories on which sales are admitted, such evidence may be improperly considered by the jury.

██ ██ This court has taken the position that the foundation for the receipt of this type of evidence rests largely within the discretion of the trial court and to warrant a reversal on either the admission or exclusion thereof a clear abuse of such discretion must be shown. Nystrom v. State, supra; State Highway Commission v. Lacey, supra. See also 1 Orgel on Valuation under Eminent Domain, 2d Ed., § 138. We are of the opinion had the trial court admitted the evidence of this sale as part of the background for the expert's opinion on value no error would have been committed; but on the other hand we are satisfied its exclusion by the trial court did not constitute a clear abuse of discretion or reversible error.

It is also claimed the court erred prejudicially in not striking the testimony of Mark Trask who testified for the landowner. The witness was a neighboring rancher and owned approximately 20,000 acres and leased an additional 10,000 acres. He had lived in the immediate area his entire life and had leased most of the Hayes property for one winter some years before. A few days before the trial he had spent an afternoon on the property, traversed the area of the new construction, and expressed a familiarity with land values in the neighborhood. Trask fixed the value of the unit before taking at from $45 to $50 per acre and gave an opinion that such value was depreciated about

50% by the taking. On cross - examination, he admitted he was without firsthand knowledge of the acreage taken, the precise number of dams on the unit and their location, and his version of the method of operation of the ranch in some respects conflicted with that of other witnesses.

 Whether a witness is properly qualified to render an opinion as to value is a preliminary question of fact to be determined by the trial court and generally a wide discretion is allowed. 1 Orgel on Valuation under Eminent Domain, 2d Ed., § 132. Neighboring property owners usually are permitted to express such opinion on the theory that being owners they are necessarily acquainted with values. Of course, the witness should be familiar with the property taken or damaged, but the extent of his knowledge and familiarity as the foundation for such opinion rests largely with the trial court and its decision will ordinarily not be disturbed unless clearly erroneous. Wahlgren v. Loup River Public Power District, 139 Neb. 489, 297 N.W. 833; City of Huron v. Jelgerhuis, 77 S.D. 600, 97 N.W.2d 314. We cannot say that the ruling of the trial judge as to the qualifications of the witness, Mark Trask, was clearly erroneous. The matters urged went to the weight of his testimony rather than to his qualifications. Foster v. United States, 8 Cir., 145 F.2d 873.

 During his opening statement, the court permitted counsel for the Hayes estate to pass photographs among the jury depicting the ranch unit and the damage caused by the taking after objection was made by the State. It is contended this constituted reversible error.

At a pre - trial conference both sides presented to the court a substantial number of photographs and maps which were marked as exhibits and foundation was waived. During the opening statement and after a considerable portion of such exhibits had been referred to by counsel in describing the ranch, the nature of the taking, and the damage caused thereby, objection was made to such photographs being passed around by the jury. The grounds of the objection were somewhat vague, but it was sustained. After some further colloquy between counsel and the court, the landowner's counsel offered into evidence

the exhibits previously marked, and counsel for the State said he had no objection to such exhibits being received in evidence, but continued his objection to passing them to the jury.

The statute, SDC 1960 Supp. 33.1307(1), provides after the jury has been selected and sworn the party having the burden of proof "shall state the issues and the general nature of the evidence he expects to produce in substantiation of the issues by stating what he claims the issuable facts to be, without argument and without naming or identifying any particular witness or exhibit by which he expects to prove any of such issuable facts." In two recent cases, Fossum v. Zurn, 78 S.D. 260, 100 N.W.2d 805; Binegar v. Day, 80 S.D. 141, 120 N.W.2d 521, we had occasion to discuss the opening statement, its purpose and object, and called specific attention to the limits imposed by the statute. In Fossum we also said that in this area "the trial judge is clothed with some measure of discretion." We can appreciate where the use of photographs, maps, and other demonstrative material and techniques in an opening statement, particularly in a condemnation case where the only issuable fact is the amount of just compensation, could be of considerable assistance to a jury in understanding "the nature and character of the controversy" before receipt of sworn testimony. Hatsio v. Red Cab Co., 77 Ohio App. 301, 67 N.E.2d 553. Nevertheless, we repeat our admonition that it is a practice which should be discouraged and rarely allowed. We believe the passing of photographs to the jury during the opening statement as occurred here is beyond the contemplation of the statute and should not have been permitted, but we are satisfied on the record before us no substantial prejudice is shown so as to warrant a reversal.

Error is also assigned in allowing to be taxed as costs the sum of $240 paid to a camera shop for taking photographs and $10.28 paid for Polaroid film. The photographs depicted various segments of the ranch and of the construction and were introduced in evidence at the trial.

SDC 1960 Supp. 33.1811 provides that the State shall be liable for costs in all civil actions prosecuted in its name to the same extent as private parties. SDC 1960 Supp. 37.4002 prohibits taxa-

tion of costs in eminent domain cases where the judgment recovered is less than compensation offered under procedure therein prescribed. Ch. 195, Laws of 1963, which provides for a declaration of taking, deposit in court, and possession pending determination of the amount of compensation due for property taken or damaged confirms existing procedural statutes and makes such chapter cumulative to other condemnation proceedings.

On the premise that the foregoing statutes permit costs to be taxed against the State in condemnation actions, respondents maintain the questioned items fall within the ambit of disbursements allowable under SDC 1960 Supp. 33.1814, viz: "In all cases where a party is allowed to recover costs the clerk must also tax as a part of the judgment the allowance of such party's witnesses', interpreters', translators', officers', and printers' fees and the necessary expense of taking depositions and procuring necessary evidence."

■ ■ The taxing of costs in litigation is a creature of statute and was unknown at common law. Since dependent on statutory provisions items of expense includible as costs can be taxed only by virtue of legislative enactment. 20 Am.Jur.,2d, Costs, § 52. Some courts disallow disbursements as taxable costs unless specifically enumerated in the statute. Broberg v. Northern Pacific Railway Co., 120 Mont. 280, 182 P.2d 851; Harrison v. Pence General Ins. Co. of America, Intervenor, 79 Idaho 377, 318 P.2d 1096. Others leave the allowance or disallowance of particular costs and disbursements to the discretion of the trial court. Ryan v. Davis, 201 Va. 79, 109 S.E.2d 409. A lack of uniformity exists among states. See Annotation, Costs Taxable, 97 A.L.R.2d 138.

■ Under our statute fees paid photographers are not specifically mentioned, so if allowable, they must come within the term of "procuring necessary evidence". We believe the statute should be construed not to cover photographer fees and expenses. The language used is broad and comprehensive and we do not say such evidence was not necessary to a proper trial of the action. However, the same is true of much that is

done in procuring necessary evidence for use at the trial. For example, most discovery proceedings are designed and initiated to procure necessary evidence. The same purpose is intended when written statements are taken from witnesses or prospective witnesses or when experts are retained and consulted. The time and money expended and the techniques employed in many instances are limited only by the ingenuity of the person using them. Much of what is done procures evidence which is necessary for the trial. Yet quite generally amounts expended and disbursements made in preparing for trial are not considered as necessary in an allowance of costs. See Annotation 97 A.L.R.2d § 15. We can visualize where to allow the expense of obtaining photographs to be taxed against an unsuccessful litigant might open the door to a "Pandora's Box" with wide variation between circuits and judges within the same circuit as to what is allowable and in what amount. Questions immediately arise as to how many photographs are considered necessary and of what type and size. What about money paid for moving pictures which more frequently are being used in personal injury cases? Can the expense be taxed only if paid to a professional photographer and should it include travel charges? If the photographs are taken by an attorney in the case, or an investigator, are such expenses chargeable? Myriad situations fraught with difficulty in application present themselves.

Such problems apparently were in the minds of the Minnesota court in a rather early case, Shterk v. Veitch, 135 Minn. 349, 160 N.W. 863, when they were asked to decide whether fees paid to civil engineers for a survey used in boundary line litigation were taxable under a statute which allowed the prevailing party disbursements "necessarily paid or incurred". Commenting on this statute the court said:

> "This is broad language, and, construed liberally, would include every expense of the prevailing party in the trial and in preparing for trial, amounts paid by a party in hunting testimony, traveling expenses of himself and his attorneys, amounts paid experts in another profession for assistance in preparation or help in trying the case, even attorney's fees. All such disbursements

and many more that might be mentioned are, in a broad sense, necessarily paid or incurred in many cases tried in the courts. But it has never been suggested that such expenses could be taxed against the defeated party. In the instant case we cannot say that the disbursements were not 'necessarily paid' in the preparation of plaintiff for trial, as it would involve holding that the finding of the trial court that they were is not sustained by the evidence — manifestly an unsound conclusion. But it seems to us that we ought to say that such disbursements as these are not taxable; that the statute should not be construed to cover them. We have suggested the chief reason for this conclusion, the impossibility of drawing the line, and it is needless to call attention to the abuses that would likely result from holding such disbursements taxable."

▉ It is our opinion that the sum of $250.28 paid for photographs used at the trial should not have been taxed as costs against the State and this amount should be deducted from the judgment.

As so modified, the judgment is affirmed. The parties are to bear their own costs on appeal.

RENTTO, P. J., and ROBERTS and HANSON, JJ, concur.

BIEGELMEIER, J., dissents.

BIEGELMEIER, Judge (dissenting).

The majority opinion declares "(g)reat latitude is allowed in the reception of evidence to prove the value of property in condemnation cases" and no "competent evidence should be excluded which an ordinarily prudent man would take into account before forming a judgment as to the market value of property which he is about to purchase." Despite this it affirms the trial court's ruling which excluded evidence of a sale of a 1,103 acre ranch adjacent to the defendants' ranch sold to one of defendants within a year for $23 an acre. This seems to me to be in-

consistent as such a sale would certainly be considered by a prospective purchaser and especially as it was offered only as a basis of the opinion of the witness. Further, it was proffered evidence which would also "aid the trier of fact in arriving at a conclusion * * * of value" and "should (have been) received" in accord with the court's statement. In my opinion it was error to exclude this evidence and that it was prejudicial appears from the verdict. The record here does not show the State gave the trial court an opportunity to review the verdict by a motion for a new trial. However, deducting defendants' valuations of $8,000 for the 160 acres of land taken, it appears the jury awarded over $60,000 as severance damages, yet defendants remain owners of 3,875 acres of their 4,034 acre ranch, which defendants' witness valued roughly from $160,000 to $200,000, and the total verdict is from 35% to 43% of its value. The jury should have been advised of this sale, and I cannot therefore concur in the opinion. See the recent opinion Weeden v. City of Beloit, Wis., 1966, 139 N.W.2d 616, where the court states "sales used as a foundation or partial foundation of an expert's opinion of value are admissible and if not comparable, go to the weight of the expert's opinion, not their admissibility."