Henry MUNDERLOH, Plaintiff, Respondent in # 11868, and Appellant in # 11904,

v.

Oscar SEASTROM, Helen Seastrom, Bryce D. Nelson and Betty Nelson, Defendants and Third-Party Plaintiffs, Respondents in # 11868 and # 11904,

v.

Sylvester M. SIMON and June M. Simon, Third-Party Defendants, Appellants in # 11868, and Respondents in # 11904.

Nos. 11868, 11904.

Supreme Court of South Dakota.

Sept. 28, 1978.

---

Robert W. Gunderson of Gunderson, Far-rar, Aldrich, Warder, DeMersseman & Johnson, Rapid City, for plaintiff, respondent in No. 11868, and appellant in No. 11904.

Jeffrey W. Davis of Sieler, Sieler & Trimble, Rapid City, for defendants and third-party plaintiffs, respondents in Nos. 11868 and 11904.

James T. Goetz and Robert W. Hirsch of Goetz, Hirsch, Haar & Klimisch, Yankton, for third-party defendants, appellants in No. 11868, and respondents in No. 11904.

WOLLMAN, Chief Justice.

This complex breach of contract action arises out of a three party real estate transaction. In 1972, third party defendants, Sylvester and June Simon (the Simons), owned approximately four thousand acres of Potter County farmland. For several years they had contemplated exchanging their farm for a ranch in the Black Hills area that their son could manage more easily. Early in 1972, the Simons engaged a Mobridge real estate agent to sell their farm. They informed him that it was essential that the sale be ultimately accomplished by a tax-free exchange for Black Hills property.

In July of 1972, the real estate agent informed plaintiff, Henry Munderloh (Munderloh), that the Simons farm was for sale. After looking at the property, Munderloh expressed serious interest in acquiring it through a cash transaction. That prospect of a cash sale cleared the way for the Simons to negotiate with a Black Hills seller who needed cash.

In the fall of 1971, Simon had looked over a Custer County property owned by defendants, Oscar Seastrom, Bryce Nelson, and their wives (the Seastrom/Nelsons), known as the Battle Creek Ranch. On October 16, 1972, Simon and his agent drove out to Rapid City, and the following day, after looking over the ranch and talking to Bryce Nelson, the ranch manager, Simon executed a preliminary offer and agreement to purchase the six thousand acre Battle Creek Ranch. Subsequently, in late October of 1972, Munderloh offered the Simons $100 per acre for their four thousand acres.

On November 8, 1972, Munderloh, the Simons, the Seastrom/Nelsons, and their respective agents and attorneys met in Mobridge and executed the agreements that form the basis of the claims in this action. Under one of the agreements, the Seastrom/Nelsons were to transfer their Battle Creek Ranch to the Simons in exchange for thirty-two hundred acres of the Simons' farmland and $50,000. By the other agree-

ment, the Seastrom/Nelsons were to sell the thirty-two hundred acres of Potter County land to Munderloh for $320,000. Pursuant to these agreements, Munderloh paid $40,000 and the Simons paid $1,000 down to the Seastrom/Nelsons. Under a third agreement, the Simons were to sell their remaining eight hundred acres directly to Mrs. Munderloh. The combined effect of these agreements was to have resulted in Munderloh and his wife becoming the owners of the four thousand acre Potter County farm, the Simons becoming the owners of the six thousand acre Battle Creek Ranch, and the Seastrom/Nelsons receiving $370,000 in cash.

The agreements each fixed February 15, 1973, as the date for closing. At the appointed time, all the parties and their attorneys appeared at the office in Mobridge where the closing was to occur. After considerable preliminary discussion, the Simons refused to go through with the closing and walked out of the meeting. On March 15, 1973, the Simons served a formal notice of rescission of their trade agreement with the Seastrom/Nelsons. On April 2, 1973, the Seastrom/Nelsons entered into a contract to sell the Battle Creek Ranch to one Fred Weibert; the sale was completed by conveyance on June 7, 1973.

Munderloh brought this action against the Seastrom/Nelsons for specific performance and for damages. The Seastrom/Nelsons then commenced a third party action against the Simons demanding damages and further demanding that any damages awarded to Munderloh in the principal action be assessed against the Simons. The Simons raised the affirmative defenses of fraud and failure of consideration and filed a counterclaim praying for rescission of their exchange agreement with the Seastrom/Nelsons, for judgment quieting their title in the Potter County farm, for the return of their down payment, and for damages.

A partial summary judgment was entered dismissing Munderloh's claim for specific performance on the ground that the Seastrom/Nelsons' sale of the Battle Creek Ranch to a non-party had rendered specific performance of the agreements impossible. The trial court refused to grant the Simons' motion for summary judgment based on the contention that an undisclosed suit for specific performance of the Battle Creek Ranch maintained by the Seastrom/Nelsons against one George Fish throughout their negotiations with the Simons rendered their title unmarketable and constituted a failure of consideration as a matter of law. At the time of trial the suit was one for damages on the part of Munderloh and the Seastrom/Nelsons and for rescission and damages on the part of the Simons. The issues of fact presented to the jury by the instructions were generally whether either the Seastrom/Nelsons or the Simons or both had caused the contemplated transactions to fail, whether either or both were guilty of bad faith, and whether the Seastrom/Nelsons had committed fraud in their dealings with the Simons.

Contiguous to the six thousand acres of land actually owned by the Seastrom/Nelsons were some three thousand acres of National Forest service grassland on which the Seastrom/Nelsons held grazing permits. The factual issues before the jury revolved principally around the actions of the Seastrom/Nelsons, the Simons, and their agents relative to this land. It was undisputed that this grazing land formed an integral part of the Battle Creek Ranch operation. The existing permit was a winter lease that entitled the Seastrom/Nelsons to pasture two hundred grazing units over a five month period. The ranch had operated under that winter permit system not only during the Seastrom/Nelsons' tenure but under previous tenants as well, and both Bryce Nelson and the Forest Service Ranger, George Geiger, testified that the winter grazing permit made the best use of the Forest Service land.

The Simons, however, wished to utilize the Forest Service land for summer grazing. The testimony was conflicting on the substance and the timing of representations made by Bryce Nelson and others concerning the facility with which the grazing per-

mit could be changed from a winter into a summer lease and concerning the carrying capacity of the land as a summer lease. The Simons' witnesses generally testified that Nelson represented that there would be no problem in transferring the lease from a winter to a summer lease and that the winter carrying capacity of two hundred head could be maintained under a summer lease. The Seastrom/Nelsons evidence showed that they had represented that the lease could be transferred with no problem, that they thought it could be changed from winter to summer, but that the final decision on the transfer rested with the Forest Service. George Geiger, the Forest Service Ranger in charge of the permit, testified that Mr. Simon had asked him for his help in getting out of the contract. He further testified that had the Simons provided the necessary proof of the impending exchange—proof within their power to provide—the winter lease would have been transferred as a matter of course. He also testified, however, that if the lease were changed from a winter to a summer lease, the carrying capacity would have to be reduced from two hundred to one hundred forty-seven head and better watering and fencing would have to be installed. Bryce Nelson testified that he told Mr. Simon that the entire ranch had a carrying capacity of three hundred twenty-five head. Mr. Simon claimed he was told that it would carry three hundred fifty head. There was testimony both from the Seastrom/Nelsons and from a subsequent purchaser that the actual carrying capacity of the Battle Creek Ranch was in excess of four hundred head.

The parties provided in the exchange agreement itself that:

[S]econd parties [the Simons] will make an application for such Lease with the Forest Service and second parties will diligently pursue said matter in order to obtain said Lease and have it issued to them by February 15, 1973 so that said grazing lands may be used with the lands which by the terms of this Agreement first parties are conveying to second parties.

On February 15, 1973, the Simons had not yet obtained a transfer of the grazing lease.

The court instructed the jury that the pending suit for specific performance brought by the Seastrom/Nelsons against Fish constituted neither a defect in the Battle Creek Ranch title nor a failure of consideration. The court further instructed that Munderloh, was absolutely entitled to have judgment for the return of his $40,000 down payment plus interest.

The court submitted the case to the jury on a series of special interrogatories. The jury found specifically that the Seastrom/Nelsons had made no fraudulent misrepresentations to the Simons; that the Simons had agreed to convey four thousand acres of land to Munderloh; that the Simons were responsible for the failure of the agreements to be performed; that the Simons were guilty of bad faith in breaching the agreement; that the Simons were not justified in not performing their exchange agreement with the Seastrom/Nelsons; that the value of the Simons' farm on February 15, 1973, was $107.50 per acre; and that the Seastrom/Nelsons had incurred damages in the amount of $2,500. Appended to the jury's verdict on damages for the Seastrom/Nelsons was the following explanation: "Beings they have already had access to $40,000 from Henry Munderloh and $1,000 from Sylvester Simon we have awarded only $2,500 for expenses incurred."

The Simons appeal from the judgment entered on the verdict against them. Munderloh cross appeals from an order denying his motion to amend the complaint to join the Simons as parties defendant in the principal action and to reinstate his prayer for specific performance, from an order granting terms to the Simons, and from the award of damages. We affirm in part and reverse in part and remand for further proceedings.

█ The Simons contend that they were entitled to rescind the contract for the exchange of their land for the Battle Creek Ranch because of the pending litigation between the Seastrom/Nelsons and Fish con-

cerning the ranch. We do not agree. The contract between the Seastrom/Nelsons and the Simons provided that the Seastrom/Nelsons would take proper steps to overcome any "legal and valid" objections to the title. As of the February 15, 1973, meeting at which the Simons refused to perform, the only objections the Simons raised to the title were technical defects in abstract descriptions that were resolved to the satisfaction of the Simons' attorney at that meeting. Indeed, their then attorney did not learn of the Seastrom/Nelson-Fish litigation until sometime in March or April of 1973. Clearly, then, the litigation was not the cause of the Simons' refusal to complete the transaction on the February 15 closing date. Rather, it was used as an after-the-fact justification for the Simons' attempted rescission. That this attempted rescission was not made in good faith is demonstrated by the Simons' refusal to give the Seastrom/Nelsons the opportunity, as provided by the contract, to overcome any objections that the Simons might have had to the title based upon the Seastrom/Nelson-Fish litigation. The Simons cite *Larson v. Thomas*, 51 S.D. 564, 215 N.W. 927, in support of their argument that they were entitled to rescind. We conclude, however, that that case offers them no support, for it holds in part that a contract vendee may not rescind so long as the contract vendor is making a sincere effort to perform his duty to perfect the title. In *Renner v. Crisman*, 80 S.D. 532, 127 N.W.2d 717, we held that a defect that is removable at the time of the completion of the contract is not grounds for denying specific performance of the contract vendee's obligation to complete the purchase. Here, the Simons gave the Seastrom/Nelsons no opportunity to remove the defect, if any, on the title, hence they should not be heard to contend that they were entitled to rescind because of the Seastrom/Nelsons' failure to furnish marketable title. The fact that shortly after the February 15 closing date the Seastrom/Nelsons were able to convey title to the Battle Creek Ranch that was satisfactory to a third party purchaser and his lender gives lie to the argument that the

Fish litigation was such a cloud on the title as to justify rescission. Accordingly, the trial court did not err in its ruling on this issue.

■ The Simons contend that the trial court erred in permitting Bill Meyer, the real estate agent who had entered into an agreement with the Simons to try to find a buyer for the Potter County land, to testify concerning the increase in the value of the land between the date of the trade agreement and the date the transaction was to have been completed, citing Meyer's alleged lack of familiarity with comparable sales of land in the Potter County area during the period from November of 1972 to February of 1973. Although it is true that the witness had not made a study of comparable sales in the area during the period in question, we conclude that the trial court did not err in permitting Mr. Meyer to express his opinion concerning the value of the Simons' land as of February 15, 1973. Mr. Meyer demonstrated a general familiarity with land values in the area. He had made numerous appraisals of farm and ranch properties since 1960. He had handled some sales of Potter County land prior to arranging the trade and sale of the Simons' land. He was quite familiar with the Simons' property, having shown it to at least two other buyers, one of whom was prepared to buy it, during the period from January to November of 1972. In view of Mr. Meyer's familiarity with the property and his substantial experience with selling farm and ranch properties in the area, the trial court acted well within its discretion in permitting him to testify concerning the February 15, 1973, value of the Simons' land. As we said in *State Highway Commission v. Hayes Estate*, 82 S.D. 27, 140 N.W.2d 680:

> Whether a witness is properly qualified to render an opinion as to value is a preliminary question of fact to be determined by the trial court and generally a wide discretion is allowed. . . . Of course, the witness should be familiar with the property taken or damaged, but the extent of his knowledge and familiar-

ity as the foundation for such opinion rests largely with the trial court and its decision will ordinarily not be disturbed unless clearly erroneous. 82 S.D. at 42, 140 N.W.2d at 688.

See also *Frawley Ranches, Inc. v. Lasher*, S.D., 270 N.W.2d 366.

The Simons' reliance on our decision in *State Highway Commission v. Anderson*, S.D., 242 N.W.2d 674, is misplaced, for the error in that case resulted from the trial court's refusal to permit the expert witness to testify with respect to the basis on which he had reached his opinion regarding value. In the instant case, counsel conducted a searching cross examination with respect to Mr. Meyer's alleged lack of familiarity with land values in the area of the Simons' property. Just as in the Hayes Estate case, supra, the objection went to the weight of the witness' testimony rather than to his qualifications.

■ Next, the Simons contend that the trial court erred in permitting the Seastrom/Nelsons to recover damages for realtor's fees, interest, taxes, insurance premiums, travel costs incurred in attending the closing in Mobridge, and alleged losses on sales of livestock in contemplation of the completion of the transaction. Although the Simons cite SDCL 21–2–3 as establishing the correct measure of damages, we conclude that the controlling statute is SDCL 21–2–4, which provides:

> The detriment caused by the breach of an agreement to purchase an estate in real property, is deemed to be the excess, if any, of the amount which would have been due to the seller under the contract, over the value of the property to him.

Although a literal reading of that statute would seem to preclude the award of damages other than those necessary to compensate a vendor for his loss of bargain, the California courts have construed California Civil Code § 3307, which is identical to SDCL 21–2–4, as permitting a vendor to recover consequential damages from a defaulting vendee. The rationale for the rule permitting such recovery was expressed by the California Supreme Court in *Royer v. Carter*, 37 Cal.2d 544, 233 P.2d 539:

> When, as under section 3307, the measure of damages is designed to assure to the vendor the benefit of his bargain, additional damages should not be allowed for expenses that would have been incurred had the contract been performed. To do so would place the vendor in a better position than he would have been in had there been no breach. Civil Code, § 3358. Thus, plaintiff would have paid the expenses from the proceeds of the sale had the contract been performed. If she is given the equivalent of the proceeds of the sale under section 3307 she is not also entitled to expenses that she would have incurred in any event.
>
> In many cases, however, the vendee's breach may make it necessary for the vendor to incur additional expenses to realize the benefit of his bargain. Given the rule that the value of the property to the seller under section 3307 is ordinarily the market value at the time of the breach, *Employees' Participating Ass'n v. Pine*, 91 Cal.App.2d 299, 301, 204 P.2d 965, and cases cited, injustice could result if the vendor were not allowed to recover damages for additional expenses caused him by the vendee's breach. Thus in a case where the property is sold at the market value and that value remains constant until after the breach, and the property is then resold at the same price, the vendor could recover no damages under section 3307. He would be forced to pay, however, in addition to the expenses of the first sale, the expenses of the resale. When such additional expenses are the natural consequence of the breach, they may be recovered in addition to those provided for in section 3307. 37 Cal.2d at 550, 233 P.2d at 543.

Subsequent California decisions have built upon the rule expressed in the *Royer* case. See, e. g., *Honey v. Henry's Franchise Leasing Corp. of America*, 64 Cal.2d 801, 52 Cal.Rptr. 18, 415 P.2d 833; *Abrams v. Motter*, 3 Cal.App.3d 828, 83 Cal.Rptr. 855; *Kudokas v. Balkus*, 26 Cal.App.3d 744,

103 Cal.Rptr. 318. Cf. *Gerhardt v. Fleck,* N.D., 256 N.W.2d 547. But see, *Whitney v. Bails,* Mont., 560 P.2d 1344.

■ We are of the opinion that the rule adopted by the California courts should be followed in applying the provisions of SDCL 21–2–4. When measured against that statute as so construed, some of the elements of damages purportedly suffered by the Seastrom/Nelsons may not be properly compensable. For example, it is not clear from the evidence whether the Seastrom/Nelsons became obligated to pay a commission upon both the incompleted exchange with the Simons and upon the subsequent sale to Weibert, or only upon the latter transaction. If only one commission was payable, then the Simons should not be held liable for an item of expense that was properly chargeable to the Seastrom/Nelsons. So also with the abstracting costs and attorneys fees incurred in preparing for the February 15, 1973, closing. These were costs that would have been paid by the Seastrom/Nelsons had the transaction been completed, and to the extent that they were not incurred in connection with the sale to Weibert they should not be chargeable to the Simons. The same analysis would hold true with respect to the costs incurred by the Seastrom/Nelsons in traveling to Mobridge to attend the closing. Inasmuch as the Seastrom/Nelsons' cattle were sold in October of 1972 and the ranch was ultimately sold to Weibert in April of 1973, the Simons should not be charged with the alleged losses resulting from the sale of the livestock. The situation regarding Seastrom/Nelsons payment of interest, taxes, and insurance premiums from February 15, 1973, to the date of the sale to Weibert is not so clear, however. Compare *Allen v. Enomoto,* 228 Cal.App.2d 798, 39 Cal.Rptr. 815, with *Abrams v. Motter,* supra. As did the court in the *Abrams* case, we leave it to the trial court on remand to determine whether these items of expense are properly chargeable to the Simons, taking into account the nature of the Seastrom/Nelsons' continued occupation of the Battle Creek Ranch property from February 15, 1973, to the date of the sale to Weibert.

■ Related to the issue of damages flowing from the Simons' breach of contract is the Simons' contention that the trial court erred in not directing that the Seastrom/Nelsons be required to restore the $40,000 down payment received from Munderloh and the $1,000 down payment received from the Simons. The effect of permitting the Seastrom/Nelsons to retain the $41,000 was to confuse the jury regarding the amount due the Seastrom/Nelsons from the Simons, as demonstrated by the note added to the verdict form in which the jury attempted to explain the award of $2,500 to the Seastrom/Nelsons. When added to the $41,000, the award of $2,500 clearly exceeds the damages established by the Seastrom/Nelsons' evidence even if all of the items that we have held were improperly admitted had been properly before the jury. Accordingly, that portion of the judgment that awards damages to the Seastrom/Nelsons as against the Simons must be reversed.

The Simons allege that the trial court erred in making certain rulings on challenged testimony and in refusing to give certain requested instructions and verdict forms. Some of these alleged errors are rendered moot by our affirmance of the trial court's ruling that the Seastrom/Nelson-Fish litigation did not constitute a defect in the title to the Battle Creek Ranch, and the remaining claims of error do not raise matters requiring reversal.

# 11904—THE MUNDERLOH APPEAL

■ Munderloh contends that the trial court erred in denying his motion to amend his complaint to state a claim directly against the Simons for specific performance of their agreement to convey the entire four thousand acre Potter County farm to him and his wife. We conclude that the trial court did not err in so doing. Aside from the fact that there was an unappealed judgment that had dismissed Munderloh's complaint against the Simons for specific performance of the agreement to sell eight hundred acres of the Potter County farm directly to Mrs.

Munderloh, the fact remains that all parties understood that the Simons wanted to effect a tax-free exchange of their Potter County land for the Black Hills property and were not willing to convey directly to Munderloh. For the trial court to have permitted the amendment would have been to give Munderloh an opportunity to seek the enforcement of a contract that the parties had never entered into.

Other matters raised in Munderloh's appeal do not present issues of reversible error.

## CONCLUSION

In appeal # 11868, that portion of the judgment which awards damages in favor of the Seastrom/Nelsons against the Simons is reversed. In all other respects, the judgment is affirmed. In appeal # 11904, the orders appealed from are affirmed.

The case is remanded to the circuit court for further proceedings not inconsistent with the views expressed in this opinion.

DUNN and ZASTROW and MORGAN, JJ., concur.

PORTER, J., deeming himself disqualified, took no part in the decision.