Frank DOLEZAL and Anna Dolezal, husband and wife, Appellees,

v.

The CITY OF CEDAR RAPIDS, Iowa, and the Cedar Rapids, Iowa, Airport Commission, Appellants.

No. 55403.

Supreme Court of Iowa.

July 3, 1973.

Rehearing Denied Sept. 13, 1973.

William M. Dallas, Cedar Rapids, for appellants.

D. C. Nolan and John T. Nolan, Iowa City, for appellees.

MASON, Justice.

Plaintiffs, Frank and Anna Dolezal, husband and wife, appealed to the district court from the assessment of damages by condemnation commissioners for the acquisition of a clearance easement and certain rights of construction directly affecting 45.37 acres of plaintiffs' land and buildings located thereon. From the award based on a jury verdict in the district court, defendants, the City of Cedar Rapids and the Cedar Rapids Airport Commission, have appealed to this court.

Defendants do not assert the amount of the jury's verdict is excessive. Rather, er-

rors in admission of evidence and denial of requested instructions are assigned.

In 1929, plaintiffs purchased farmland located immediately east of the Cedar Rapids Municipal Airport, which airport is owned and operated by defendant—City of Cedar Rapids, and is under the management of defendant—Cedar Rapids Airport Commission. A north-south gravel road runs along the west boundary of plaintiffs' property separating the farm from the airport. A railroad right of way and tracks are located between the road and plaintiffs' premises. The land has never been used for anything but farming. Since July 14, 1959, the farm had been zoned D-Rural under a Linn County zoning ordinance. The condemnation proceedings affect only two existing structures, plaintiffs' home and a barn.

June 4, 1970, the City of Cedar Rapids instituted condemnation proceedings pursuant to chapters 330 and 472, The Code, to acquire a clearance easement over plaintiffs' land and to obtain the right to install and maintain double obstruction lights on buildings belonging to plaintiffs. The application for condemnation filed by the City expressly provides:

"For the acquisition by condemnation of a clearance or obstruction easement providing a clear zone approach at the east end of the East-West Runway, Cedar Rapids Municipal Airport, and at the Southeast end of the Northwest-Southeast Runway, Cedar Rapids Municipal Airport, and for the continuing right to construct, operate, and maintain double obstruction lights to be mounted on a house and barn shown on the plat covered by the clearance easement at the east end of the East-West Runway.

" * * *

"6. The applicant specifically states that an avigation easement or the right to make free flights over the land is not sought nor required.

"7. The sole purpose of the acquisition of the clearance easements is to improve visibility and reduce hazards to the landing or taking off of aircraft at the Cedar Rapids Airport, * * *."

The court in City of Oakland v. Nutter, 13 Cal.App.3d 752, 763, 92 Cal.Rptr. 347, 353, points out that, "A distinction has been recognized between an 'avigation' or 'flight' easement and a 'clearance' or 'obstruction' easement."

The following statement appears in footnote 13:

"In United States v. Brondum (5 Cir. 1959) 272 F.2d 642, the court observed with respect to the latter, ' * * * the right to cut trees and natural growth to a prescribed height and to remove man-made obstructions above a prescribed height * * * is sometimes referred to as a "flight obstruction easement". Graphically and accurately, Judge Estes describes the easement as a "ceiling". The purpose of the ceiling is to increase the margin of safety for flying by assuring that the glide zone will be free from natural growth or man-made obstructions and the pilot's vision unobscured above a designated altitude.

"An avigation easement may or may not contain provisions dealing with obstructions, but, unlike a clearance easement, in express terms it permits free flights over the land in question. It provides not just for flights in the air as a public highway —in that sense no easement would be necessary; it provides for flights that may be so low and so frequent as to amount to a taking of the property.' "

On June 15 appointed commissioners appraised the consequent damages and filed their award in the amount of $3200.

Thereafter plaintiffs appealed to the district court, alleging in division 1 of their petition the value of the land had been diminished in five particulars. In division 2, plaintiffs sought a writ of mandamus to compel defendants to institute condemnation proceedings for the acquisition of an avigation easement. The trial court

concluded there was an improper joinder of actions in plaintiffs' petition and ordered division 2 of the petition to be separately docketed as an equity action for writ of mandamus. Accordingly, the case proceeded to trial before a jury on division 1 of plaintiffs' position. A verdict fixing plaintiffs' damages in the amount of $46,500 was returned. Defendants moved for a new trial on the grounds the court erred in its ruling on the introduction of evidence and the refusal of instructions requested by defendants. The motion was overruled.

Defendants appeal from all final judgments and decisions entered in favor of plaintiffs, assigning three grounds for reversal: (1) the court erred in permitting the plaintiffs' value witnesses to express opinions as to the value of the farm prior to condemnation on the assumption that its highest and best use was industrial rather than agricultural because it was reasonably probable the land would be rezoned for industrial use, and in placing an enhanced value on the farm because of its proximity to the airport; (2) the court erred in admitting the opinion testimony of a witness who expressly predicated his conclusion as to the value of the farm after condemnation, in part, on burdens to which the land would have been subjected only if an avigation easement had been acquired; and (3) the court erred in refusing the defendants' requested instructions 1 and 3.

 I. The proper basis for an award of damages in this case is the difference in the fair market value of plaintiffs' farm immediately before and immediately after condemnation. Crozier v. Iowa-Illinois Gas and Electric Company, 165 N.W.2d 833, 835 (Iowa 1969). The extent to which the farm has been damaged or reduced in value by the obstruction light installation and clearance easement is the ultimate fact to be determined by the jury.

 If they are to prove this diminished value, plaintiffs must initially estab-lish the fair market value of the land before condemnation. Any factor that would impress a willing buyer in purchasing the farm, if otherwise competent, is both material and relevant for this purpose. Van Horn v. Iowa Public Service Company, 182 N.W.2d 365, 371 (Iowa 1970). Thus, plaintiffs were entitled to present evidence concerning the highest and best use of the property. Reeder v. Iowa State Highway Commission, 166 N.W.2d 839, 841 (Iowa 1969). As this court stated in Mohr v. Iowa State Highway Commission, 255 Iowa 711, 720, 124 N.W.2d 141, 147:

"In general, considerable latitude is allowed in the admission of evidence of the capabilities of land affected by a condemnation and the uses to which it may reasonably be adapted. It is true there must be a present demand for the land for such uses or reasonable expectation of such demand in the near future. It must be remembered too that such evidence is to be considered only for the effect it has on market value at the time of the taking, not at some future time.

"This from Ranck v. City of Cedar Rapids, 134 Iowa 563, 565–566, 111 N.W. 1027, 1028, states the rule we have applied: ' * * * the owner is entitled to have the jury informed of all the capabilities of the property, as to the business or use, if any, to which it has been devoted, and of any and every use to which it may reasonably be adapted or applied. And this rule includes the adaptation and value of the property for any legitimate purpose of business, even though it has never been so used, and the owner has no present intention to devote it to such use (citations).' "

 Although a landowner is permitted to show the highest and best use of the property involved is for a purpose for which the property has not theretofore been used, this more profitable use must be one allowed by law to be carried out on the premises. Thus, if existing zoning restrictions preclude the more profitable use, ordinarily such use cannot be considered

by the jury in arriving at its decision. At the same time, if there is a reasonable probability the zoning classification will be changed in the near future, that probability should be considered in determining the proper value. Jones v. Iowa State Highway Comm., 259 Iowa 616, 625–626, 144 N.W.2d 277, 282–283. The trial court embodied these principles in its instruction 10, which reads as follows:

"You should determine the fair and reasonable market value of the property involved on the basis of the highest and best use to *which the property was reasonably adapted* at the time of the condemnation on June 15, 1970.

"The highest and best use to which the property was reasonably adapted must be a use permitted by the zoning classification in effect on June 15, 1970, or a use permitted by a different zoning classification if on June 15, 1970, there was a *reasonable probability* of a change in the near future of the zoning classification. The burden of proof is on plaintiffs to establish by a preponderance of the evidence the *reasonable probability* of such a zoning classification change." (Emphasis supplied)

The jury was therefore instructed to determine: (1) what is the highest and best use to which plaintiffs' land was "reasonably adapted at the time of condemnation;" (2) whether the zoning regulations governing the land presently permit the highest and best use to which the property was reasonably adapted or a reasonable probability exists that zoning in the near future will accommodate such a use. Hence, unless plaintiffs proved by a preponderance of the evidence there was a reasonable probability of rezoning, the highest and best use of the land here involved was for agricultural purposes, as the farm was zoned rural at the time of condemnation.

Defendants inferentially concede the highest and best use of the farm before the taking is a proper issue in the present case. But, in their first assigned error, defendants urge that opinions of plaintiffs' experts as to the value of the land immediately prior to the appropriation should have been stricken because they were based on the invalid assumption the highest and best use of the farm prior to condemnation was for industrial purposes involving the erection of structures which could have exceeded the height limitations imposed by the clearance easements; and that the court erroneously permitted witnesses to express the opinion it was reasonably probable the farm would be rezoned in the near future for an industrial use permitting the construction of buildings or objects to a height in excess of those limitations imposed by the easement.

Defendants argue their objections to the testimony of plaintiffs' value experts should have been sustained since the facts related by the witnesses were insufficient as a matter of law to serve as a factual basis for the opinions expressed that the highest and best use of the farm on June 15, 1970 was for light industrial. Also, the court should have ruled, as a matter of law, plaintiffs failed to sufficiently prove it was reasonably probable at the time of taking the land would be rezoned in the near future from an agricultural to an industrial classification.

First to be considered is defendants' contention relative to the opinion testimony the highest and best use to which plaintiffs' farm was adapted prior to condemnation (or at the time of taking), was industrial, not agricultural. At the outset it is necessary to express the significance of the fact that, assuming the land was adaptable to industrial use and the zoning laws were changed to permit such use, this condemnation proceeding could have diminished the value of plaintiffs' farm aside from the trimming of trees and erection of lights only if it were possible prior to the appropriation giving rise to this case to construct buildings and objects on the land affected by the easement in excess of the height limitations imposed thereby. If

both the actual and prospective uses of the land prior to condemnation were limited by restrictions similar to those imposed by the clearance easement, plaintiffs have not been damaged in the amount of $46,500. In other words, has this condemnation proceeding negated or in any way qualified "the highest and best use to which the property was reasonably adapted at the time of condemnation" on June 15, 1970?

Defendants submit plaintiffs' land was neither *physically* nor *legally* "adapted to the erection of buildings thereon for industrial use at a height in excess of that which was limited by the easements." Defendants premise their conclusion the land was not physically adapted to any industrial use on the testimony sewer and water were not reasonably available on the farm. Defendants assert, "as a matter of law, the land was not then adaptable for industrial use," in the absence of sewer and water. The valuation witnesses for plaintiffs and defendants testified sewer and water would be necessary to operate a factory. However, none of the witnesses stated the adaptability of land to an industrial use is dependent upon the presence of sewer and water. In light of testimony concerning other, seemingly equally important attributes of the land, such as proximity to a railroad, public highway and airport and the availability of natural gas, it could not be held, as a matter of law, it was physically impossible to use the land for industrial purposes.

To understand the latter phase of defendants' initial contention under the first assigned error—*legal* impossibility—reference must be had to the pertinent state statutes and the county zoning ordinances enforce prior to and on June 15, 1970, the date of condemnation. Two provisions of the country zoning ordinance were applicable to plaintiffs' farm: the land was zoned "D–Rural," precluding any use of the property for industrial purposes. A second provision, subsection 4 of Article XX, was introduced in evidence by defendants and reads as follows:

"No building or structure or any portion thereof which exceeds a height of twenty (20) feet shall be erected or structurally altered within four hundred (400) feet of the projected center line of an existing or proposed runway or landing strip for a distance of eight hundred (800) feet from the airport or landing field. Beyond a distance of eight hundred (800) feet from the airport or landing field no building or structure or any portion thereof shall be erected to exceed a height that would interfere with the take off or landing of a plane with a glide angle of one (1) foot vertical for every forty (40) feet horizontal, such glide to be computed as beginning at the boundary line of the airport or landing field."

Assuming defendants' calculations are correct as stated in their brief, approximately 52 percent of plaintiffs' land within the easement limitations of 21 feet through 61 feet was thus subject to slightly more burdensome restrictions at the time of condemnation. Consequently, defendants conclude the farm has not been reduced in value, as a matter of law, since the limitations imposed by the easement permit the land to be used in the manner it was, or might have been, used in the past.

The validity of that conclusion requires a further determination of whether plaintiffs' valuation witnesses could have based their opinions as to plaintiffs' damages on the imposition of height restrictions over the remaining 48 percent of the affected tract of land. Again, we note that any substantial diminution in value for which plaintiffs may recover must stem solely from the height restrictions imposed over plaintiffs' land by the clearance easement.

Defendants advance a somewhat tenuous argument in support of their assertion it was legally impossible for the other 48 percent of the land to be adapted to a type of industrial use now precluded by the clearance easement. They, in effect, invert the logic of plaintiffs' witnesses, who argued the farm was adaptable to industrial uses

because of its proximity to the airport. Defendants contend the close proximity of the land to the airport in fact made it "legally impossible" at the time of condemnation to use the remaining 48 percent of the land subject to the easement for any industrial purpose prohibited by the terms of the easement.

Defendants refer the court to the provisions of chapters 329 and 330, The Code, which define procedures to prevent the erection of or to remove any structures protruding above the ground which would create an airport hazard, or obstruct the air space necessary for the safe and efficient flight of aircraft in landing or taking off at the airport. Any attempt to use the farmland for an industrial use involving the construction of buildings exceeding in height the limitations of the instant easement, defendants argue, would have precipitated the kind of condemnation proceeding instituted here. Hence, it was "legally impossible" to use the remaining 48 percent of the land for such industrial purposes.

Defendants' argument must fail on the basis of its own terminology. Although it is unlikely plaintiffs would successfully install buildings exceeding the height limitations of this easement on this particular portion of their land, given the requisite change of zoning, the statutes do not prohibit such an endeavor. On the contrary, it was legally possible for one to use the remaining acres now subject to the clearance easement for *any* industrial purpose.

Additional restrictions imposed by the clearance easement could not have "additionally" reduced the value of the farm, if the land directly affected by the county zoning ordinance and the area subject to the easement were coextensive. But they were not, and plaintiffs' witnesses considered the fact the remaining acres, unaffected by the zoning ordinance but subject to the easement, were reasonably adapted to *any* industrial use at the time of the condemnation. More significantly, the witnesses' testimony indicates they were aware of the restrictions then existing under Article XX, Subsection 4 of the county zoning ordinance, and did in fact consider them in arriving at their opinions as to the diminution in value of plaintiffs' farm. One of the witnesses gave this testimony:

"Q. Mr. Yager, assuming without admitting that there was not this flight easement set out in the zoning ordinance, 400 feet from each side of the center line and 800 feet from the east edge of the airport, would your appraisal damages have been higher or lower?

"* * *

"A. Because of the area involved, I would say approximately $12,000 higher."

Defendants' contention the opinions of plaintiffs' experts should have been stricken because such opinions were based on the invalid assumption the highest and best use of the farm prior to condemnation was for industrial purposes involving erection of structures which could have exceeded the height limitations imposed by the clearance easements is without merit.

The foregoing determination does not aid defendants in sustaining their contention that the facts related by plaintiffs' expert witnesses were insufficient to furnish an adequate foundation for the opinions expressed.

This statement of law announced in Bernal v. Bernhardt, 180 N.W.2d 437, 441 (Iowa 1970) is also adverse to defendants' position:

"Before a witness who has been qualified as an expert in the pertinent field can express his opinion on the particular issues involved, whether he is testifying in whole or in part from his personal knowledge and observation or in response to a hypothetical question, the facts upon which the opinion is based must be stated by the witness or in the hypothetical question. From this evidence the court, in the first instance, can determine whether the factual foundation is sufficient for a valid opinion or the answer would be nothing more than

mere conjecture or guess, and the trier of fact, in the last instance can determine whether the alleged facts justify his conclusion. The acceptance or rejection of opinion testimony does not depend upon the expert's abstract qualifications alone. * * * [citing authorities]." See also Albrecht v. Rausch, 193 N.W.2d 492, 495 (Iowa 1972).

It is obvious under the record the trial court determined in the first instance the factual foundation was sufficient for a valid opinion. It then properly submitted to the jury the question whether the alleged facts justified the opinions expressed.

The trial court's ruling was correct.

Therefore, the question of adaptability for industrial uses was properly placed before the trier of fact if plaintiffs further showed there was "a reasonable probability of a change in the near future of the zoning classification."

Next to be considered, then, is the second contention raised under defendants' first assigned error, that the court erred in permitting witnesses to express their opinions as to whether it was reasonably probable the farm would be rezoned within the near future for industrial use; moreover, the court should have ruled, as a matter of law, plaintiffs failed to show by sufficient proof the reasonable probability of a zoning change.

Mr. Joseph Zeman, a member of the Linn County Zoning Commission, gave the following testimony:

"Q. Now, Mr. Zeman, state whether or not in your opinion the Dolezal farm on June 15, 1970, there was a reasonable probability of rezoning that farm within the near future as of that date upon proper application for commercial and or industrial uses.

"* * *

"A. Yes, I think it could be.

"* * *

"Q. Now, what do you base that opinion upon, Mr. Zeman?

"* * *

"A. Well, on the railroad right-of-way, on your access to it, freight way to your airline. And its a coming; you can see that every day.

"* * *

"Q. * * * The fact that a piece of property is located on a railroad and a railroad siting or access if readily available, would that be a favorable factor in considering an application for rezoning from agricultural to industrial use?

"* * *

"A. Favorable to it."

Another witness, Mr. Lowell Yager, who is a valuation expert, testified in part as follows:

"Q. And are you familiar with where there has been change in zoning from rural to industrial in other counties—.

"* * *

"A. I am familiar in other areas where they have changed from rural to light industrial type zoning.

"Q. Now, what are the factors in your opinion that would lead to the reasonable probability of the rezoning of the Dolezal property within the reasonable near future as of June 15, 1970; what are some of the conditions on the Dolezal farm that would lead you to that belief? A. The Dolezal property located near the airport, because of noise factors in this area, would indicate that it would be more suited for light industrial property than it would residential or other types of property. Also because of rail siding, the railroad is there at the present time, this would indicate that it could have industrial use and the probability that it could be changed to an industrial area. There are also some industries in the area—the farm service outlet that is there; we've heard about the cabinet construction company that is there and the

heavy equipment operation that's in this immediate area.

"Q. The fact that there's natural gas available to the premises, would that have any effect? A. Yes, it would."

A second expert witness for plaintiffs testified:

"I have testified as to what I thought was the fair and reasonable market value of the Dolezal property immediately prior to the condemnation on June 15, 1970. That valuation was based on the assumption that, if they made application in the reasonably near future to have that property rezoned for industrial use, it would probably be rezoned to industrial."

Timely objections were interposed by defendants' counsel to the testimony of the three witnesses quoted herein, and at the close of plaintiffs' evidence defendants moved to have that testimony stricken from the record.

It has been previously determined plaintiffs generated a question for the trier of fact on the issue of whether plaintiffs' land not within the area subject to Article XX, subsection 4 of the county zoning ordinance was reasonably adaptable for industrial uses. Plaintiffs were also required to establish by a preponderance of the evidence the reasonable probability of a change in the zoning in the near future to permit an industrial use. As this court stated in Jones v. Iowa State Highway Comm., 259 Iowa at 626, 144 N.W.2d at 283, "The question is whether the land is so situated that a willing buyer would consider the probability of a change in zoning in the near future in arriving at a price for the land." If that question were resolved in the affirmative, the highest and best use to which plaintiffs' land was reasonably adapted at the time of the condemnation was for industrial purposes.

In addition to the facts upon which plaintiffs' witnesses expressly based their opinions, the record shows the county zoning commission had recommended that eighty acres of land located one-half mile from plaintiffs' farm be rezoned from agricultural to industrial use only a few days prior to this trial; that industrially zoned property used as a stockyard was situated adjacent to plaintiffs' farm; and that a commercial cabinet company and a heavy equipment operation were located in close proximity to plaintiffs' land.

■ The court did not err in overruling defendants' motion to strike this testimony of Mr. Yager and Mr. Schlaegel on the ground urged for both related facts sufficient to afford foundation for the opinions expressed. These facts taken into consideration by the witnesses in arriving at their opinions as to the probability of a zoning change furnish an adequate foundation for the opinions expressed. It was proper to permit the jury to consider whether those facts justified the opinions expressed. Bernal v. Bernhardt, 180 N. W.2d at 441.

These statements from Kaperonis v. Iowa State Highway Comm., 251 Iowa 39, 43–44, 99 N.W.2d 284, 287, are appropriate:

"This means only that the matter was properly placed before the trier of the facts for it to make such decision as its best judgment warranted. It does not mean that, because the question was submitted to the jury, it was bound to decide that there was adaptibility for industrial use, or if it so found that such use was so reasonably probable as to enhance the value."

■ Defendants urge as a final contention under their first assigned error that plaintiffs' valuation witnesses should not have been permitted to base their opinions in part upon the proximity of the farm to the airport. However, this alleged error was not raised by proper objection or motion at any stage of the proceedings in the trial court.

At no point did defendants alert the trial court that they were contending proximity

to the airport was an improper factor for consideration by the jury. The record presents nothing for review in this court as to this contention. See State v. Schurman, 205 N.W.2d 732, 735 (Iowa 1973) and State v. Williams, 207 N.W.2d 98 (Iowa, filed April 25, 1973).

We have considered every contention raised by defendants in the eight brief points urged under this assignment before reaching the conclusion the assignment is without merit.

II. Defendants' second and third assignments of error, jointly argued in division 2 of their brief, will be considered separately below. One arises from rulings on evidence and the other from the refusal of requested instructions. Error in each instance is predicated on the legal proposition that the elements of damage to be considered in a determination of the diminution in value of condemned property are limited by the exact nature of the rights acquired and burdens imposed upon the land by the condemnation proceedings.

Stated otherwise, defendants contend the rulings of the court improperly permitted the jury to return damages for diminution in value of plaintiffs' property because of the taking of rights which were not in fact acquired under the condemnation proceedings; a diminution in value because of low level flights, or the fear thereof, over the premises could only be recovered in a proceeding brought to acquire a flight or avigation easement.

In connection with their argument in support of these combined assignments of error defendants properly distinguish between a clearance or obstruction easement on the one hand and an avigation or flight easement on the other. See footnote 13, City of Oakland v. Nutter, 13 Cal.App.3d at 763, 92 Cal.Rptr. at 353. Defendants point out the fact their application for condemnation specifically restricted the rights acquired by the condemnation proceedings to the clearance and obstruction easements, and expressly excluded the acquisition of any right to fly aircraft over the land of the condemnees. Defendants insist they did not acquire a right to engage in any activity that would create a condition of danger.

The trial judge acknowledged the distinction between clearance and flight easements when he ordered division 2 of plaintiffs' petition to be separately docketed as an equity action for writ of mandamus.

The trial court gave recognition again to the distinction in ruling on defendants' motion to strike paragraph 6(d) of plaintiffs' petition. Plaintiffs had alleged in the paragraph under attack that one of the particulars in which their premises had been diminished in value was on account of "the exposure of the plaintiffs' premises to lower flight travel and flight patterns of airplanes approaching and leaving the aforesaid municipal airport of Cedar Rapids, Iowa."

In its ruling the court said:

"The effect of flight travel on plaintiffs' property interests is not an element of damage in determining plaintiffs' proper compensation for defendants' acquisition of a clearance or obstruction easement by way of condemnation. It is an element to be considered in the measure of damage for condemnation of an avigation easement."

The scope and limitations of the easements rights obtained by the condemnation are set forth in plaintiffs' exhibits 1, 2 and 3 which were in evidence. These rights are defined as (1) the right to a clearance or obstruction easement over plaintiffs' premises at the east end of the east-west runway at the airport; (2) the right to a clearance or obstruction easement over plaintiffs' premises at the southeast end of the northwest-southeast runway at the airport; and (3) the right to construct, operate and maintain double instruction lights to be mounted on the house and barn on plaintiffs' premises together with the nec-

essary electrical circuits to supply the power to the lights.

The right to a clearance or obstruction easement necessary for safe and efficient flight of aircraft in landing and taking off at the east end of the east-west runway and at the southeast end of the northwest-southeast runway was described in the application to consist of the right to have the air space free from structures or objects protruding above the surface of the ground at greater heights than specified in defendants' application.

Defendants admitted in their pleadings that pursuant to the clearance easement they did trim the trees situated on plaintiffs' premises to a height so that they were in conformity with the easement acquired and will continue to trim such trees to keep the same in conformity with the easement.

Defendants first contend the court should have stricken from the record the opinion of Mr. Schlaegel as to the after-value of plaintiffs' farm because said opinion was based in part on the element of fear from low flying planes. Defendants believe the following testimony of Schlaegel elicited by defendants' counsel on cross-examination sustains their contention:

" * * * You have many different areas of damage in this case. * * *

" * * * You have what I would call a scare factor, which is a factor that if you rent these properties, * * *, were it not for these planes coming over the house at this height I'm sure that you'd get better tenants at more rent.

" * * *

"Q. * * * Now it's your—you've given consideration to the fact that you believe that the planes, that they require the right to fly lower over certain parts of the Dolezal farm than they otherwise would and that that might result in fright, intimidation, fear, and things of that kind, noise.

" * * *

"A. No, the topping of the trees. The topping of the trees would make the buyer think that this was a possibility. But, the topping of the trees was a factor I took into consideration.

"Q. In other words, if a buyer, however, made an inquiry of the easement he would learn that there was no rights acquired to fly lower, is that correct? A. The thing that would be taken into consideration if you are getting into this aviation right—I didn't get into the aviation rights.

" * * *

"Q. That you think is what the jury would—a buyer would proceed on the assumption that planes were going to fly that low ordinarily to—. A. No, that you acquired the right to cut the trees that low so that you wouldn't interfere with the planes.

"Q. In other words, you would assume that the buyer—you see, we're not talking about what you assume but what you think a buyer would assume—that he would be fearful that they would fly that low because the trees were cut, is that correct? A. I would think that, if he saw the trees cut, that he would assume it was for some purpose.

"Q. Well, in other words, the element —the fear is the element that you think would be the significant factor, not the mere—. A. The cutting of the trees would produce the fear, I guess, yes.

" * * *

"Q. In other words, fear that the planes were going to fly down and hit the house? A. You are trying to get into the aviation rights, which I don't think is in this case.

"Q. That's right, and they're not in it. But you are trying to have the buyer treat it—. A. You cut the trees and as a result of the cutting of the trees diminish the

value of the property. That's what I'm saying.

" * * *

"Q. Well, in other words, you think that people would be less likely to rent the property now than they would before the easement was acquired because of increased fear, is that it? A. Resulting from the topping of the trees only."

Defendants argue the court further erred in permitting Mr. Schlaegel to respond as follows to this question asked on redirect examination:

"Q. Mr. Schlaegel, suppose that you were showing this farm to a prospective buyer. I say suppose so. Assume that you were showing this farm to a prospective buyer and you were asked by the prospective buyer why those trees were topped and why the red lights were on the barn. What would you tell them?

" * * *

"A. If they asked me why the trees were topped, I would have to tell them that they were topped in order to give this clearance for safe and efficient flight of the planes."

■ In order to substantiate the landowner's burden to show market value of the property after condemnation, "every element which can fairly enter into the question of value and which an ordinary prudent man would consider before forming judgment in making a purchase should be considered, not as an independent element of damages but as a factor in determining the market value of the portion remaining after the taking." Van Horn v. Iowa Public Service Company, 182 N.W.2d at 371 and authorities cited.

■ Mr. Schlaegel did not refer to low flying aircraft or their attendant danger to plaintiffs' property and persons residing thereon; he did not intimate the easement acquired by defendants conferred the right to fly aircraft over plaintiffs' land at tree-top level or in close proximity to the house and barn; nor did he suggest the trees were trimmed and the clearance lights were installed to permit the flight of aircraft at these levels.

Rather, the clear inference from the record is that Mr. Schlaegel, in estimating the after-value of plaintiffs' farm simply considered as one of several factors the "fear" or apprehension a prospective purchaser might entertain before forming a judgment, having observed the trimmed trees and the red obstruction lights on the buildings. This factor was not viewed as affording an independent measure of recovery, but as being a "nonspeculative element" of disadvantage resulting from the clearance easement. Thus, the opinion of this witness involves no consideration of rights not in fact acquired under the condemnation proceedings.

■ Moreover, the court did not err in permitting Mr. Schlaegel to testify that he would inform a prospective buyer upon inquiry the trees "were topped in order to give this clearance *for safe and efficient flight of the planes*," and that some buyers consequently would not purchase the farm. The same language was employed by defendants in their application for condemnation which provides: "The applicant desires to acquire by condemnation the right to clearance or obstruction easement *for safe and efficient flight of aircraft* * * *." And in their brief, defendants state the easements "which authorized the trimming of the trees and the installation of the lights on the house and barn were acquired *for the purpose of avoiding all possibility of danger or fear thereof from low flying planes*." (All emphases supplied). *See, e. g.,* United States v. Bromdum, 272 F.2d at 644–645 ("The purpose of the ceiling [imposed by the clearance easement] is to increase the margin of safety for flying * * *."); United States v. 64.88 Acres of Land, Etc., 244 F. 2d 534, 535 (3 Cir. 1957) (Stated objective of clearance easement was the removal and prevention of flight hazards).

In connection with defendants' second assignment of error, "we have held several times that danger, or fear of danger, resulting from the exercise of condemnation rights may be shown as affecting market value. * * * [citing authorities]." Fanning v. Mapco, Inc., 181 N.W. 2d 190, 197 (Iowa 1970).

III. As indicated defendants' third assignment is directed toward the trial court's refusal to give their requested instructions 1 and 3. As summarized by defendants in their brief and argument the first requested instruction would have charged the jury, "defendants did not acquire the right by this condemnation proceeding to fly airplanes over any part of plaintiffs' farm and that no consideration should be given to such flights, or to the noise that might result therefrom, in fixing the value of the farm subsequent to the condemnation, except to the extent, if at all, that the trimming of the trees to a height permitted by the clearance easements might reduce the protection afforded by the trees as a barrier to sound emanating from airplane traffic in the vicinity of the trees."

Requested instruction 3 would have told the jury, "no avigation easement or right to make free flights over plaintiffs' land was acquired by the condemnation, and no servitude was imposed upon the land except for the precisely limited rights of clearance, as stated in the Application for Condemnation, and for the additional right to construct, operate, and maintain the double obstruction lights on plaintiffs' house and barn."

Defendants took timely and proper exceptions to the court's failure to give these requests.

The trial court in refusing defendants' requested instructions made this comment: "I believe the Exhibits 1, 2 and 3, which set forth the easement rights obtained by the condemnation, are definitive of the scope and limitation of the easements. I also think that the evidence of the witness as to fear was perfectly valid evidence indicating that existence of the lights and the topping of the trees, the physical sight thereof, could cause many people to be cautious about buying the property or limit the amount they would be willing to offer for it, so that it, I think, relates very directly to the issue of value before and value after the taking."

Defendants' contention the court erred in failing to instruct the jury to disregard any reference to the rights and burdens which would result from the acquisition of a flight easement stems from their claim Mr. Schlaegel's testimony introduced the effect of flight travel on plaintiffs' property as an element of damage in determining plaintiffs' compensation for defendants' acquisition of a clearance easement. As argued, the validity of the assignment depends on the merit of their claim as to Schlaegel's testimony. That is, they only argue the instructions were necessary because of the testimony of Mr. Schlaegel concerning the apprehension of a prospective purchaser caused by the trimmed trees and clearance lights.

Having determined his testimony did not relate to the flight of aircraft over plaintiffs' farm, refusal of the court to instruct the jury that no avigation easement to fly aircraft over plaintiffs' land was acquired by defendants was not error. It does not appear from a reading of the instructions as a whole that the court failed to properly explain the rights acquired by the condemnation of the clearance easement so that the jury was left to speculate as to its meaning and the rights acquired by defendants.

The case is therefore affirmed.

MOORE, C. J., and RAWLINGS, LeGRAND and REYNOLDSON, JJ., concur.

McCORMICK, REES, UHLENHOPP and HARRIS, JJ., dissent.

McCORMICK, Justice (dissenting).

I respectfully dissent from Division III and the result.

I cannot join the majority in approving the failure of a trial court to define for a jury the nature and scope of the taking in an eminent domain case in the face of requested instructions properly explaining it. This approval is particularly disturbing in the present case where the taking is unusual and highly technical.

Trial court's refusal of the requested instructions violates "the universally accepted rule that where requested instructions state correct rules of law and the substance of the request is not covered by the instructions given by the court on its own motion, the requested instructions should be given." Welton v. Iowa State Highway Commission, 211 Iowa 625, 636–637, 233 N.W. 876, 883 (1930).

Two justifications for the refusal are suggested. One is that the exhibits, specifically the condemnation application, show what was being taken. The other is that the testimony of witness Schlaegel was an insufficient predicate for the instructions. Neither ground is tenable.

The majority opinion sets out relevant portions of the condemnation application and the substance of requested instructions 1 and 3. Comparison demonstrates that the assertion the application contains the substance of the instructions is not true. There is nothing in the application or any of the exhibits by which the jury was told as they would have been told by requested instruction 1 that "defendants did not acquire the right by this condemnation proceeding to fly airplanes over any part of plaintiff's farm *and that no consideration should be given to such flights, or to the noise that might result therefrom, in fixing the value of the farm subsequent to the condemnation, except to the extent, if at all, that the trimming of the trees to a height permitted by the clearance easements might reduce the protection afforded by the trees as a barrier to sound emanating from airplane traffic in the vicinity of the trees."* The court's instructions do not mention any factors which could or could not be considered in arriving at valuation of the farm. Nor do the instructions or exhibits tell the jury, as would requested instruction 3, that the condemnation imposed no servitude on the land except for the precisely limited rights of clearance and the right to keep obstruction lights on plaintiff's house and barn.

Furthermore, even if the exhibits did purport somehow to apply the law of eminent domain to the facts of the case, their language is the language of the parties and is not an adequate or acceptable substitute for the language of the court.

The requested instructions are proper statements of the law on the heart of the lawsuit. Rights acquired under a clearance easement are not understood intuitively nor are they a matter of common knowledge. The majority opinion finds the novel concept involved in such easements explained, not in the trial exhibits or instructions, but in an obscure footnote in City of Oakland v. Nutter, 13 Cal.App.3d 752, 763, 92 Cal. Rptr. 347, 353 (1970). See also Nichols on Eminent Domain, § 5.781 at 5–292 (Third Ed. 1970). The concept is difficult for lawyers and judges. How then can a lay jury be expected to comprehend a technical easement without intelligible instructions from the court when those trained in the law must resort to lawbooks and treatises to find out what it means?

Proper instructions defining and explaining the nature of the taking and factors legitimately bearing on valuation should have been given. "In easement condemnation cases, the purposes, rights and limitations of the condemnors in the use of easements are of great variety and must be clearly delineated. It is the duty of the trial court by way of instructions in the court's charge to explain the rights of the parties under the particular easement being sought." Ruble v. City of San Antonio, 479

S.W.2d 86, 88 (Tex.Civ.App.1972). See also Lehman v. Iowa State Highway Commission, 251 Iowa 77, 99 N.W.2d 404 (1959); City of Statesville v. Bowles, 6 N.C.App. 124, 169 S.E.2d 467, 470–471 (1969).

The majority's response that this assignment of error depends on the merit of defendants' claim as to the inadmissibility of witness Schlaegel's testimony is wholly unwarranted. The assignment is dependent on the Schlaegel testimony only insofar as such evidence illustrates the necessity of putting the nature of the taking into proper perspective for the jury. The requested instructions presuppose Schlaegel's testimony is in the record. The fallacy in the majority's reasoning is its assumption that the fact Schlaegel's testimony was properly received is conclusive of its force and weight. However, the fact evidence is admissible for some purpose does not make it admissible for all purposes. This is why a trial court is obliged to apply the law to the record.

The gist of Schlaegel's testimony concerning fear as a factor in reducing the land's value is that such fear would result from a prospective purchaser's impression the topping of the trees and placement of lights signified planes would be flying low over the land. While Schlaegel knew such fear was unwarranted from the taking of a clearance rather than an avigation easement, he asserted he would simply tell a prospective buyer the easement was "to provide clearance for safe and efficient operation of planes." That is, if he were attempting to sell the land he would tell the prospect only the *purpose* of the easement *but not the nature and extent of the rights acquired under it.* The credibility of this evidence was for the jury. It was for the jury to say whether it believed a seller of the property would not attempt to allay an erroneous apprehension that the easement gave defendants avigation rights.

Without an understanding of the nature and scope of the easement the jury would be in no position to evaluate Schlaegel's testimony. Under the court's instructions the jury would not know anything more about the distinction between a clearance and avigation easement than a buyer from Schlaegel. What Schlaegel's testimony meant in terms of the legal issues in the case was a matter upon which the record demanded (and defendants requested) appropriate guidance for the jury.

Even if trial court would have been justified in refusing to give the requested instructions as written, they established a duty in the court to give correct instructions on the material matters involved as to which the instructions were otherwise silent. Lehman v. Iowa State Highway Commission, *supra*; Law v. Hemmingsen, 249 Iowa 820, 89 N.W.2d 386 (1958).

The majority's conclusion that the "instructions as a whole" properly explained the rights acquired by the clearance easement is unsupportable. The rights were neither explained nor defined in *any* instruction except those refused. The result reduces our rule as to error in refusal of requested instructions to a mere form of words.

I would reverse and remand the case for new trial.

REES, UHLENHOPP, and HARRIS, JJ., join in this dissent.