BASIN ELECTRIC POWER COOPERA-
TIVE, INC., a Corporation,
Plaintiff and Appellant,

v.

Dale L. CUTLER, Kathleen Cutler, 1st Na-
tional Bank of Aberdeen, Northwestern
Mutual Life Insurance Company, Cory
Investment Company, Inc., Dan Cutler,
and Brown County, a Public Corporation,
and the sovereign State of South Dakota,
Defendants and Respondents.

No. 11689.

Supreme Court of South Dakota.

Reassigned Jan. 6, 1977.

Decided May 26, 1977.

T. R. Pardy of Mumford, Protsch, Sage & Pardy, Howard, for plaintiff and appellant.

A. William Spiry, Britton, for defendants and respondents.

ZASTROW, Justice (on reassignment).

In the retrial of this condemnation action, the plaintiff, Basin Electric Power Cooperative, Inc. (hereinafter Basin Electric), appeals from the jury verdict and judgment awarding the defendant, Dale L. Cutler (hereinafter Cutler), $34,400 damages for a perpetual easement across Cutler's property for an electrical transmission line. We reverse.

Basin Electric's appeal presents basically two questions for consideration: (1) was the

evidence of the irrigation potential of the property so speculative and remote so as to be inadmissible, and (2) should Basin Electric's counsel have been allowed to cross-examine Cutler concerning his testimony at the first trial regarding irrigation potential.

Basin Electric seeks to impose an easement for a 345 KV electrical transmission line over a 54.26-acre area across seven quarter sections of Cutler's property. Cutler presently uses the property as hay and pasture land in a cow-calf ranch operation. At the trial, Cutler's witnesses were allowed to testify that the highest and best use of the seven quarters was as crop land irrigated by a center-pivot irrigation system, but because of the construction of the power lines, such system could not be utilized.

Based upon the inability to utilize the irrigation potential of the tracts, Cutler, his value witnesses and expert appraiser estimated the damages to the property's market value from $46,000 to $57,000. The witnesses and appraisers for Basin Electric estimated the damages at $4,500 to $6,000.

Basin Electric attempted to prevent the consideration of evidence of the irrigation potential by first objecting to any testimony thereof, by motion to strike such testimony and by proposing an instruction that the jury disregard such testimony in its consideration of damages. Each of these challenges was based upon the premise that the irrigation potential was remote, uncertain and speculative.

Where power lines are constructed over private property by an exercise of eminent domain, the proper measure of damages is the fair market value of the land actually occupied by the towers, plus the diminution in value of the balance of the easement, plus the consequential damages, if any, to the remainder of the tract.[1] *Neb. Elec. Generation & Trans. Co-op. v. Tinant*, 1976, S.D., 241 N.W.2d 134. The measure of consequential damages to the remainder is the difference between the fair market value of the remainder of the tract immediately prior to the imposition of the easement and its value thereafter. *Basin Electric Power Cooperative, Inc. v. Cutler*, 1974, S.D., 217 N.W.2d 798; *State Highway Commission v. Hayes Estate*, 1966, 82 S.D. 27, 140 N.W.2d 680; Nichols on Eminent Domain, Vol. 5, § 16.103[1]; 27 Am. Jur.2d, Eminent Domain, § 344; *Neb. Elec. Generation & Trans. Co-op. v. Tinant, supra*; Annot., "Elements and measure of compensation for power lines, etc." 124 A.L.R. 407.

The extent to which the remainder has been damaged or reduced in market value by the imposition of the plaintiff's easement is the ultimate fact to be determined by the jury. *Dolezal v. City of Cedar Rapids*, 1973, Iowa, 209 N.W.2d 84. In proving the diminution of value, the defendants must establish the fair market value of the land before condemnation. The fair market value of the property includes every element which affects such value and which would influence a willing and able purchaser at the time of the taking. *State Highway Commission v. Hayes Estate, supra; State Highway Com'n v. American Memorial Parks, Inc.*, 1966, 82 S.D. 231, 144 N.W.2d 25; *Volbrecht v. State Highway Commission*, 1966, 31 Wis.2d 640, 143 N.W.2d 429; *Van Horn v. Iowa Public Service Company*, 1970, Iowa, 182 N.W.2d 365; 27 Am.Jur.2d, Eminent Domain, § 279; Nichols on Eminent Domain, Vol. 4, § 12.1.

"In general, considerable latitude is allowed in the admission of evidence of the capabilities of land affected by a condemnation and the uses to which it may reasonably be adapted. It is true there must be a present demand for the land for such uses or reasonable expectation of such demand in the near future. It must be remembered too that such evidence is to be considered only for the effect it has on market value at the time of the taking, not at some future time." *In re Primary*

1. In this situation, the tract was restricted to the seven 160-acre quarter section units crossed by the power line easement. *Basin*

*Electric Power Cooperative, Inc. v. Cutler*, 1974, S.D., 217 N.W.2d 798.

*Road No. Iowa 141,* 1963, 255 Iowa 711, 124 N.W.2d 141.

See also *Heins v. Iowa State Highways Commission,* 1971, Iowa, 185 N.W.2d 804; 27 Am.Jur.2d, Eminent Domain, § 280; McCormick, The Measure of Compensation in Eminent Domain, 17 Minn.L.Rev. 461. The owner or expert witnesses may normally testify as to the capabilities of the property to which it may be devoted and to any use to which it may be reasonably adapted or applied within the near future. *Chicago, M. & St. P. Ry. Co. v. Mason,* 1909, 23 S.D. 564, 122 N.W. 601; *Belle Fourche Valley Ry. v. Belle Fourche Land & Cattle Co.,* 1911, 28 S.D. 289, 133 N.W. 261. This includes the adaptation of use of the property for any legitimate purpose or business, even though it has never been previously used for such purpose and the owner has no present intention of devoting it to such use. *Van Horn v. Iowa Public Service Company, supra; In re Primary Road No. Iowa 141, supra; State v. Malecker,* 1963, 265 Minn. 1, 120 N.W.2d 36; *Langdon v. Loup River Public Power Dist.,* 1944, 144 Neb. 325, 13 N.W.2d 168; 29A C.J.S. Eminent Domain § 160; 31 Am.Jur.2d, Expert and Opinion Evidence, § 142; Nichols on Eminent Domain, Vol. 5, § 18.11[2]. However, the use must not be remote, speculative or uncertain. *Neb. Elec. Generation & Trans. Co-op. v. Tinant, supra.*

Cutler testified that sometime after the first trial he began investigating the feasibility of irrigating his ranch, including the seven quarters in question, to increase its productivity. The investigation included conversations with "irrigation experts" who had conducted "feasibility studies" for his ranch. Based upon his investigation, Cutler concluded that all seven quarters could be economically irrigated by a "center-pivot system." He surmised that water for the system would be obtained by damming a dry gulch on one of the quarters. Water to fill the dam would come from runoff from the surrounding land, water pumped from the Elm River overflow in the spring, and an artesian well which would be drilled. Cutler admitted that he had no actual plans for the well or the dam, and had no idea as

to the amount of water that would be available under this proposal. Because construction of the towers would prevent the use of a center-pivot irrigation system, Cutler estimated that the market value of each of the seven quarters was $50 per acre less.

Rodger Ulrich, a district conservationist with the Soil Conservation Service U.S. D.A., testified that he had supervised a "study" of the proposed dam. In his opinion, the proposed dam could hold 100 to 250-acre-feet of water. He felt that the runoff from local rainfall, pumping water from Elm River during the spring flooding, and the digging of an artesian well would provide sufficient water to fill the proposed dam.

Darrel Pahl, an irrigation specialist for the South Dakota State University Extension Service, testified that the seven quarters in question contained soil which was suited for irrigation, i. e., surface drainage, internal drainage, soil type and other factors. His conclusion was based upon his analysis of a soil map prepared in 1956, the quantity of water available (although not the capacity of the dam), and the types of crops which he would recommend be raised.

On cross-examination, Pahl admitted that (1) the amount of runoff was speculation on his part, (2) any artesian well water, because of the high sodium content, would not be suitable for irrigation purposes even if it were diluted with runoff or water from Elm River, and (3) sufficient irrigation required 100-acre-feet of water per quarter on a shared system (i. e., one center-pivot system used on two quarters at different times during the season) or 227-acre-feet of water per quarter for a permanent system (i. e., one system used on one quarter the entire season).

Mr. Shaykett, Cutler's expert appraiser, testified that in his opinion the damages to the seven quarters amounted to $57,000. The primary factor in his appraisement of damages was the inability to adapt the land to a center-pivot irrigation system, as well as the nuisance and loss of privacy caused by the erection and maintenance of the towers.

Harley Taylor, an adjoining ranchowner, testified that the damage to Cutler's land was $50 per acre on all seven quarters, a total of $56,000. Taylor testified that the primary element of damages in his opinion was the loss of the land's irrigation potential and, in addition, the difficulty of using farm equipment around the towers.

Conversely, the experts for Basin Electric testified that they had considered the potential for irrigation but had rejected it as being too speculative to have any effect upon the present market value. The Basin Electric appraisers concluded that the highest and best use was its current use and that the damage to the property ranged from $4,500 to $6,000.

As is evidenced by the briefs of both parties, the problem here is drawing that fine line between evidence of a higher and better potential use, which is admissible, and evidence of a future use which is merely speculation or conjecture, which is inadmissible. In this situation, we find that the irrigation potential was so remote and uncertain as to make any damages based upon it mere speculation and conjecture.

The irrigation potential of Cutler's property is solely dependent upon the availability of an adequate supply of water. A review of the testimony discloses several reasons why there was insufficient evidence of any irrigation potential.

(1) Plans for the proposed dam were represented to have been prepared by an "area engineer" for the Soil Conservation Service and that the capacity of the dam had been determined from his figures. However, when the "plan" was produced, it consisted of two red pencil lines on a topographical map. This is insufficient to show the probability of construction.

(2) Contrary to Cutler's assertion, there is no testimony that if the dam were built that the subsoil would hold the water or allow it to seep away, further decreasing the holding capacity of the dam.

(3) The total capacity of the dam was estimated at 100 to 250-acre-feet, an amount which would be adequate to irrigate only one, or at most, two of the quarters.[2]

(4) There is no evidence of the size of the watershed of the dry gulch or that it was sufficient to supply an adequate amount of runoff for the proposed irrigation.[3]

(5) There is no evidence that an artesian well would produce sufficient water to supplement the runoff.[4]

(6) The artesian well water has a high sodium content which makes it unsuitable for irrigation even if diluted.[5]

(7) The evidence failed to establish that the likelihood of securing a permit from the South Dakota Water Rights Commission (Commission) to obtain water from Elm River was a reasonable probability within the immediate future.[6]

Cutler contends that testimony that the Commission had issued over fifty applications for permits and denied none sufficiently established a reasonable probability. However, that testimony did not establish the type of permits granted (i. e., irrigation) nor the location. On the contrary, it appears that the City of Aberdeen has actively opposed any applications involving the Elm River, and that irrigation permits for Elm River water have not been issued for a considerable period of time.

2. The evidence shows that because of the placement of the towers, a center-pivot irrigation system can still be used on two of the quarters. There is no explanation by Cutler's value expert as to why those two quarters would suffer a loss of market value where the center-pivot system can still be used. Likewise, they gave solution to irrigating seven quarters where there could only be sufficient water for one or two quarters. See *McMillan Co. v. Nebraska Electric Generation,* 1974, 192 Neb. 744, 224 N.W.2d 184.

3. Cf. SDCL, Chapter 46–4, which requires a permit where the watershed is more than 160 acres.

4. Cf. SDCL, Chapter 46–6, which controls the capacity of artesian wells for irrigation.

5. This testimony came from Cutler's irrigation expert, Pahl.

6. See SDCL, Chapter 46–5.

Paraphrasing the general rule concerning rezoning and variance produces a reasonable rule in this situation:

"Where * * * there is a * * * probability that [an irrigation water permit] may in the near future be [granted] so as to permit the use in question, such likelihood may be considered if the prospect of such [permit] is sufficiently likely as to have an appreciable influence upon present market value. The burden of proof of the reasonable probability of [obtaining such a permit] is on the landowner. * * * It follows from the foregoing that such possible [grant of an irrigation water permit] must not be remote or speculative." Nichols on Eminent Domain, Vol. 4, § 12.322[1].

"The trial judge in a jury case is vested with considerable discretion in determining the reasonable probability of [the granting of an irrigation water permit] within a reasonable time. It has been held that where the facts establish the existence of the probability, a finding to such effect will not be defeated because an actual application for [an irrigation water permit has not been made]. The burden of proving the existence of the reasonable probability [is] upon the condemnee." Nichols on Eminent Domain, Vol. 4, § 12.322[2].

Here, the trial court specifically stated that the obtaining of such a permit was speculative. Based upon that finding, the admission of testimony of irrigation potential was erroneous.

Basin Electric asserts that the cost of establishing an irrigation system for the irrigation of this property was so substantial that the proposed irrigation could never be economically sound. However, although we agree that the proof that the evidence offered by the landowner was insufficient to allow the admission of irrigation potential, we disagree that the economics of the

potential irrigation would as a matter of law preclude establishing such a system. If all of the other factors are adequately proven by the landowner at a retrial, the cost of establishing the system would be one of those factors to be considered by the jury in determining whether or not the value of the land is substantially affected. In other words, the economic feasibility is normally a factual question for the jury to determine whether or not the irrigation potential would have any effect upon the current fair market value of the property.[7] *Belle Fourche Valley Ry. v. Belle Fourche Land & Cattle Co., supra.*

This opinion is not intended to imply that the irrigation potential of land may not be shown in a condemnation suit of this type (or even in this matter on retrial). However, it is incumbent upon the landowner to present evidence to show that any proposed irrigation was so reasonably probable at the time of the taking or within the immediate future so as to have had an effect upon the fair market value at the time of the taking. Based upon the evidence presented at the trial, we find that the irrigation potential of Cutler's property was inadmissible as being highly uncertain, speculative and conjectural, that once admitted by the court it should have been stricken upon Basin Electric's motion, and the proposed instruction should have been given under the facts as presented at this trial.

Basin Electric's final alleged error revolves around the trial court's failure to allow it to cross-examine Cutler regarding his previous testimony in the first trial of this action. Its attorney specifically attempted to cross-examine Cutler regarding his failure to testify to any irrigation potential of the land at the first trial. See *Rockwood v. Pierce,* 1952, 235 Minn. 519, 51 N.W.2d 670; *Erickson v. Erickson & Co.,*

7. It must be noted that Cutler's value witnesses did not testify that they had taken into account the cost of the establishment of an irrigation system in arriving at the estimate of damage. The appraisers for Basin Electric, on the other hand, testified that even if the land was potentially irrigable, the cost involved in building the dam and purchasing the irrigation equipment would offset any increased value and have no effect upon the current fair market value.

1942, 212 Minn. 119, 2 N.W.2d 824; 81 Am. Jur.2d, Witnesses, § 597.

We conclude that the trial court properly refused plaintiff's counsel's cross-examination. The proposed cross-examination occurred on the third day of trial after Cutler had been recalled for the third time. The cross-examination would have required the court to review the entire transcript of the first jury trial to determine if it was proper impeachment. When questioned by the court, counsel for Basin Electric was not certain whether or not Cutler's failure to assert the fact of irrigation potential at the first trial was by court order.

"The extent to which a witness may be cross-examined as to facts which are otherwise immaterial for the purpose of testing his reliability and to show bias and prejudice is ordinarily within the discretion of the trial court and much latitude is to be allowed in this line, and unless an abuse of discretion is clearly shown either in allowing or restricting such cross-examination, this court will not interfere with the ruling of the court * * *." *Plank v. Heirigs,* 1968, 83 S.D. 173, 156 N.W.2d 193.

See also *Holdridge v. Lee,* 1892, 3 S.D. 134, 52 N.W. 265.

Under the circumstances, we do not find an abuse of discretion. On retrial, we would assume that if such cross-examination is warranted, counsel will present his motion in a more orderly and timely fashion to allow the trial court a reasonable opportunity to review the transcripts.

We reverse and remand for a new trial.

DUNN, C. J., and WOLLMAN and MORGAN, JJ., concur.

PORTER, J., dissents.

PORTER, Justice (dissenting).

I respectfully dissent from the majority opinion. The landowner in an eminent domain action is entitled to show the highest and best use to which his land is adaptable. It is his burden to show a present demand for such use or a reasonable expectation of such demand within a reasonable time in the future. Such evidence should be considered only with respect to its effect on market value at the time of the taking. *Dolezal v. City of Cedar Rapids, Iowa,* Iowa, 209 N.W.2d 84 (1973). 4 Nichols on Eminent Domain § 12.314, at 12–201 (3d ed. 1976). Potential uses that are too contingent, speculative, or remote to affect the present market value should not be considered. 4A Nichols on Eminent Domain § 14.241, at 14–152.1 (3d ed. 1976).

This state has followed a liberal course with regard to admissibility of evidence to prove valuation in condemnation proceedings.

"Great latitude is allowed in the reception of evidence to prove the value of property in condemnation cases, and generally any relevant and material evidence, if competent under general rules of evidence, is admissible to prove market value. . . . No competent evidence should be excluded which an ordinarily prudent man would take into account before forming a judgment as to the market value of property which he is about to purchase. If the proffered evidence tends to aid the trier of fact in arriving at a conclusion on the issue of value and damage, it should be received." *State Highway Commission v. Hayes Estate,* 82 S.D. 27, 140 N.W.2d 680, 686–87 (1966) (citations omitted).

It cannot be said under the breadth of this rule that evidence of irrigation potential was not relevant to the present market value of the farm land in this case. Nor may it be said that such evidence was incompetent. It was based on the testimony of expert witnesses who the trial court found qualified to express their respective opinions. The real question is one of fact to be determined by the jury: whether the evidence establishes by a preponderance that irrigation is such a reasonably prospective use that it affected the present market value of the property. Such a question should not be decided by the court under

the guise of determining admissibility of evidence. *Iske v. Metropolitan Utilities District of Omaha,* 183 Neb. 34, 157 N.W.2d 887 (1968).

However, if after consideration of evidence relevant to the question of reasonable prospective use, the court decides, on proper motion, that the evidence is speculative as a matter of law, the question may be kept from the jury. *Nebraska Electric Generation and Transmission Cooperative, Inc. v. Tinant,* S.D., 241 N.W.2d 134 (1976). Plaintiff sought to keep the question of irrigation potential away from the jury by making a general motion to strike all testimony on the subject as speculative. The trial judge denied its motion. I do not find that ruling erroneous, because, for the reasons set out below, I do not find the evidence on irrigation speculative, *as a matter of law.* Therefore, I would allow the jury to decide if irrigation is such a reasonably probable use that it affects the present market value of the condemned property.

Viewing the record in the light most favorable to the verdict winner, the state of the evidence at the time the motion to strike was made justified the trial judge in submitting the irrigation issue to the jury. Based on the testimony of several experts, the evidence showed that the highest and best use of the property in question was as cropland. Part of the land had been used for crop production several years prior to conversion to its present use as a cow-calf operation. Based on soil studies the land was suited as cropland and was also suited for irrigation.

Pursuant to the landowner's request a study was conducted by the soil conservation service on the location of a dam to be used for irrigation. A site had been selected. Based on records of past rainfall such a dam would have a maximum capacity of 250 acre feet of water. Runoff was sufficient to fill the dam to 50 per cent of capacity; the remaining water could be

obtained from the Elm River during periods of high flow.

The landowner had also requested a study on the irrigability of his property and pursuant to the study an irrigation specialist had recommended irrigation by use of center pivot systems. By sharing center pivot systems between two quarters, the land could be economically irrigated. One hundred acre feet of water per quarter would be required for such an operation. The testimony was that the land was now worth less because the towers placed on the property interfered with the use of center pivot irrigation.

Admittedly many matters were brought out on cross-examination which undermined the factors relied on by the experts in reaching their opinions. Matters such as lack of a water permit, inadequate water supply for all seven quarters, and absence of a blueprint for the dam undoubtedly weakened the landowner's case. However, these are factors to be weighed by the jury in reaching the factual determination of just compensation. A challenge to the factors considered by an expert in arriving at an opinion of damages, goes to the weight to be given to that opinion by the jury. *Dash v. State,* Alaska, 491 P.2d 1069 (1971). Evidence of the reasonable probability of irrigation, while not as strong as it might have been, had sufficient foundation to justify the court in rejecting the motion to strike and the proposed instruction.[1]

The jury was properly instructed on the question of just compensation, to include instructions on highest and best use, uses that may be reasonably expected in the near future, and speculative and remote matters not supported by the evidence. The jury could have properly concluded that irrigation potential, given the limited water supply, beneficially affected the present market value of at least a part of the property in question and thus was a proper consideration for the jury in their determination of the damage sustained by

---

1. Plaintiff's proposed instruction was as follows:

"You are instructed that the possibility of irrigation on the subject property is remote

reason of taking.[2]  I would therefore affirm the judgment.

Instruction 9 provided:

"It is established that the land included in the perpetual easement acquired by the plaintiff in this action is a portion and a part of a larger tract of land belonging to defendants as is shown and described by the evidence.

When rights as to a portion of a tract of land is so condemned under condemnation proceedings, just compensation to the landowner is the amount which is equal to the difference between the fair market value of the entire property immediately before the condemnation and the fair market value of the property immediately after the condemnation.

You will find an award the owners of each parcel one sum which will represent the entire difference in reasonable market value of his property before the condemnation and the reasonable market value after the condemnation even though seperate and various items or elements enter into your deliberation in arriving at the same.

The laws of this state provide that the tract which may be considered in determining the difference between the fair market value immediately before the condemnation and the fair market value of the property after the condemnation shall in no case extend beyond the quarter sections of land through which the easement is granted."

Instruction 12 is in a similar vein:

"In determining what 'just compensation' shall be as to each parcel in this case, you should carefully follow the following instructions: Just compensation due the landowner in this type of case is that amount which is equal to the difference between the fair market value of his property immediately before the taking and the fair market value of his property immediately after the taking.  In other words, the just compensation is the depreciation in the market value of each of these parcels that is occasioned by the taking of this easement by Basin Electric Power Cooperative, Inc.  For the purpose of determining fair market value, the date of the taking is January 28, 1975."

The above instructions were given by the trial court without objection.

and speculative and not to be considered by you in your deliberations."

2. The jury was instructed that they could properly consider the effect on the present market value of each parcel affected by the easement, but that they were to award one sum to reflect the entire damage to the property.